MISSISSIPPI MILK COMMISSION *v.* VANCE, et al.

No. 41924 April 24, 1961 129 So. 2d 642

*John L. Hatcher,* Cleveland; *W. E. McIntyre, Jr.,* Brandon, Assts. Atty. Gen., for the appellant.

*Currie & Currie, Alfred Moore,* Hattiesburg; *Wells, Thomas & Wells,* Jackson, for appellees.

LEE, P. J.

This is an appeal by the Mississippi Milk Commission from a final decree of the Chancery Court of Forrest County, which held that Section 15, Chapter 155, Laws of 1960, on its face and in its application, insofar as the fixing of maximum and minimum prices of milk is concerned, is in violation of Sections 14, 16 and 17, Article III, of the Constitution of this State.

The litigation arose in this manner: The Legislature, at its regular session in 1960, enacted Senate Bill No. 1757, Chapter 155, which was styled in part: "AN ACT to create a commission designated as the Mississippi Milk Commission to supervise and regulate the production, transportation, storage, distribution, and sale of fluid milk and to regulate the dairy industry; to provide for the licensing of producer distributors, dealers or handlers, and retail stores dealing in fluid milk; to regulate and fix minimum prices for fluid milk at the producer level, and minimum and maximum prices at the wholesale and retail levels; to provide for the raising of funds for the administration of this act and defraying the cost and expenses thereof; to impose penalties for the violation of the act and rules and regulations lawfully issued thereunder; * * * and for other purposes."

By Section 1 of the Act, the statement of legislative policy was declared as follows:

"(a) That milk is a necessary article of food for human consumption.

"(b) That the production and maintenance of an adequate supply of healthful milk of proper chemical and physical content, free from contamination, is vital to the public health and welfare.

"(c) That the production, transportation, processing, storage, distribution, and sale of milk, in the State of Mississippi, is an industry affecting the public health and interest.

"(d) That unfair, unjust, destructive, and demoralizing trade practices have been and are now being carried on in the production, transportation, processing, storage, distribution, and sale of milk, which trade practices constitute a constant menace to the health and welfare of the inhabitants of this State.

"(e) That health regulations alone are insufficient to prevent disturbances in the milk industry and to insure the consuming public an adequate supply of this necessary commodity.

"(f) That it is the policy of this State to promote, foster and encourage the intelligent production and orderly marketing of fluid milk and cream; to eliminate speculation and waste, and to make the distribution thereof between the producer and consumer as efficient and economical as possible, and to stabilize the marketing of such commodities.

"(g) That investigations have revealed and experience has shown, that due to the nature of milk and the conditions surrounding the production and marketing of milk, and due to the vital importance of milk to the health and well being of the citizens of this State, it is necessary to invoke the police powers of the State to provide a constant supervision and regulation of the milk industry of the State to prevent the occurrence and recurrence of those unfair, unjust, destructive, demoralizing and chaotic conditions and trade practices within the industry, and in the retail grocery trade which have in the past affected the industry and the retail grocery trade, and which constantly threaten to be revived within the industry and the retail grocery trade, and to disrupt or destroy an adequate supply of pure and wholesome milk to the consuming public and to the citizens of this State.

"(h) That fluid milk is a perishable commodity, which cannot be stored for any great length of time, which must be produced and distributed fresh daily and the supply

of which cannot be regulated from day to day, and due to natural and seasonal conditions cannot be produced on a constantly uniform and even basis.

"(i) That the demand for this perishable commodity fluctuates from day to day and from time to time making it necessary that the producers and milk dealers or handlers shall produce and carry on hand a surplus of milk in order to guarantee and insure to the consuming public an adequate supply at all times, which surplus must of necessity be converted into by-products of milk at great expense and ofttimes at a loss to the producer and milk dealer or handler.

"(j) That this surplus of milk, though necessary and unavoidable, unless regulated, tends to undermine and destroy the fluid milk industry, which causes producers to relax their diligence in complying with the provisions of the health authorities and ofttimes to produce milk of an inferior and unsanitary quality.

"(k) That investigation and experience have further shown that, due to the nature of milk and the conditions surrounding its production and marketing, unless the producers, milk dealers or handlers and others engaged in the marketing of milk are guaranteed and insured a reasonable and fair return on milk, both the supply and quality of milk is affected to the detriment of, and against the best interest of the citizens of this State whose health and well-being is thereby vitally affected.

"(1) That, where no supervision and regulation is provided for the orderly and economical marketing of milk, past experience has shown that the credit status of both producers and milk dealers or handlers of milk is adversely affected to a serious degree thereby entailing loss and hardship upon all within the community with whom these producers and distributors carry on business relations."

Section 15 thereof, which deals with the designation of marketing areas and the fixing of prices for milk, provides as follows:

"(a) The Commission shall ascertain after a hearing in which all interested persons shall be given reasonable opportunity to be heard, the logical and reasonable milk marketing areas within the State shall describe the territorial limit thereof and shall designate such areas by name or number, provided, however, that the Commission may determine that the State of Mississippi is one natural milk marketing area. The Commission in its discretion may increase or decrease the number of milk marketing areas, combine one or more milk marketing areas or alter the boundaries of milk marketing areas in order to carry out the purposes of this Act.

"(b) The Commission shall investigate the costs and charges for producing, hauling, bottling, packaging, distributing, processing and marketing of milk and other services performed in relation to milk and determine what are the reasonable charges and cost therefor, and investigate and determine what prices are reasonable for milk produced, marketed and sold in the various locations and markets in the State and what prices will, under the various and varying conditions existing in the different locations and markets within the State best insure a sufficient quantity of pure and wholesome milk to the inhabitants of the State and a fair return to the members of the dairy industry and be most in the public interest. In its determination, the Commission shall take into consideration the balance between production and consumption of milk, the cost of production and distribution in the marketing of milk, both wholesale and retail and the purchasing power of the consuming public in the various localities and markets throughout the State.

"(c) The Commission shall hold public hearings and hear evidence under oath relative to the prices to be

fixed for the sale of milk and the charges for handling, transportation and processing of milk in the area, after first publishing a notice of the hearing and the purposes thereof once each week for three weeks in a newspaper having general circulation in the area. At such hearing, persons engaged in the dairy industry, persons who operate stores, members of the consuming public and any other persons who have information pertinent to the subjects under consideration, and any persons whose testimony is desired by the Commission, may give testimony under oath relative to prices and charges to be fixed. Any official publication of the United States Department of Agriculture, and any bulletins, computations, announcements, or other official publications of any Federal Milk Market Administrator, and any official publication or record of the Commissioner of Agriculture and Commerce of the State of Mississippi or the equivalent officer of other states, and of similar milk commissions of other states which is pertinent to the fixing of prices and charges in the marketing area may be admitted in evidence and made a part of the record of hearing at the discretion of the Commission. The testimony of record taken in any other hearing in the State may also be considered provided a copy of the record is made available during the hearing for examination by all interested parties and is made a part of the current hearing record by reference. A stenographic record shall be taken of the testimony and evidence received at the hearing shall be transcribed and kept on file in the office of the Commission and open to public inspection. Any person may obtain a copy of the record by ordering same from the reporter not later than the last day of the hearing and paying the reporter for same at the rate fixed by law for records of trials transcribed by court reporters.

"(d) After consideration of the evidence made of record in a hearing or hearings, the Commission shall

file at its office for each order issued a general statement in writing of the findings of fact in support of and the reason for such order and shall fix by official order for each marketing area the following: (1) minimum prices to be paid for milk by milk dealers or handlers to producers or associations of producers. Provided, however, that when fixing prices in areas where prices for milk purchased by a dealer or handler from Mississippi producers are fixed by a Federal Milk Marketing Order issued by the United States Department of Agriculture under provisions of the Agricultural Marketing Act of 1937, the Commission shall accept such order prices as minimum prices or may establish prices above such order prices, (2) minimum, and may fix maximum except trademarked breed milk, or other premium milks, or both, wholesale or retail prices to be charged and received by producers, associations of producers, producer-distributors and milk dealers or handlers for milk sold, delivered, handled, or consigned within the milk marketing area for fluid consumption, regardless of where the milk is produced, including milk sold, delivered or consigned by them to consumers and to stores, either for consumption at the store or sale to consumers; and (3) minimum, and may fix maximum except trade-marked breed milk, or other premium milks, or both, retail prices to be charged and received by stores to consumers, except for consumption at the store where sold. The Commission also may fix the amount of charges to be allowed for the handling, transporting, and cooling, of milk or any one or more of such charges between milk dealers or handlers and producers.

''(e) Orders of the Commission fixing minimum or maximum prices may vary in different marketing areas and shall designate the markets to which applicable. The Commission may in each order fix prices of milk or handling charges, classify milk by classes, grades, or utilization and specify the minimum or maximum prices or

charges except trade-marked breed milk, or other premium milks, or both, in each classification, grade, or utilization. The Commission is empowered in fixing prices for packaged fluid milk to take into consideration the size of containers used.

"(f) Orders of the Commission fixing minimum prices to be paid to producers shall classify milk in accordance with the form in which or the purpose for which it is used, and fix or provide a method of fixing minimum prices for each such use classification which all handlers shall pay and the time and method of making payments to be made, for milk purchased from producers or associations of producers. Such prices shall be uniform to all handlers subject only to adjustments for (1) handling, transporting, and cooling as customarily applied by the milk dealers or handlers subject to such orders and as approved by the Commission; (2) the grade or quality of the milk purchased; (3) the location at which such delivery of milk or any use classification thereof is made to any milk dealer or handler; and (4) a further adjustment equitably to apportion the total volume of milk purchased by any handlers among producers and associations of producers on the basis of their marketings of milk during a representative period of time.

"If such orders are approved by at least two-thirds (⅔) of the producers voting, who during each of the six (6) months preceding the referendum were engaged in regular production of milk for marketing to milk dealers or handlers subject to such orders, orders of the Commission fixing prices to be paid to producers may provide for the payment to all producers and associations of producers delivering milk to all milk dealers or handlers of uniform prices for all milk so delivered irrespective of the use made of such milk by the individual handler to whom it is delivered subject only to adjustments for (1) handling, transporting, and cooling, as customarily applied by the milk dealer or handler sub-

ject to such orders; (2) the grade or quality of the milk purchased; (3) the location at which delivery of such milk or any use classification thereof is made to such milk dealers or handlers; and (4) a further adjustment, equitably to apportion the total volume of milk purchased by any handler, or by all handlers, among producers and associations of producers on the basis of their marketings of milk during a representative period of time. The Commission shall provide terms and conditions in such order if approved by the producers voting in the referendum, for making adjustments and payments among milk dealers or handlers (including producers who are also milk dealers or handlers) to the end that the total sums paid by each milk dealer or handler shall equal the volume of milk purchased by him at the prices fixed in accordance with the first paragraph of this sub-section.

"(g) In determining which segment of the dairy industry shall receive the benefit of any price changes granted by the Commission, a producer price of Five Dollars and Twenty-Five Cents ($5.25) per hundredweight for milk testing four (4) percent butterfat F. O. B. the milk dealer or handler's plant and a delivered wholesale price of Twenty-two (22) Cents per quart of pasteurized or homogenized milk shall be used as the norm. Increases or decreases from the norm shall be based on changes in the delivered wholesale price for pasteurized or homogenized milk, using as a further basis a yield of forty-five (45) quarts of pasteurized or homogenized milk from each one hundred pounds of producer milk. The benefit of increases or decreases from the stated norm shall accrue one-third (⅓) to the milk dealers or handlers and two-thirds (⅔) to the producers for whom the Commission establishes prices.

"(h) The Commission may from time to time on its own motion, or on application showing good cause, hold a hearing in the same manner as provided for in the

original fixing of prices to receive evidence relative to altering, revising, or amending any order theretofore made by it with reference to fixing prices for milk or handling, transporting or cooling charges and may alter, revise, or amend such prior orders in accordance with the determination made by it on the basis of the testimony at such hearing. If after such hearing there be further hearing before the Commission on any proposed order, notice of such further hearing shall be given to the parties represented and heard in the previous hearing. Upon application in writing from a person aggrieved by an order of the Commission fixing prices filed within fifteen (15) days after the issuance of the order complained of or upon its own motion, the Commission may within twenty (20) days after the effective date of such order issue an order revising or amending such order without further hearing if the Commission should conclude that such revision or amendment is justified on the record of the hearing held prior to the issuance of such order.

"(i) All provisions of all price fixing orders of the Commission shall be presumed to be valid and the burden of proving any invalidity of any provision thereof, shall be upon the person asserting the same. Any determination by the Commission or court to which an appeal has been taken as hereinafter provided, that the producer, wholesale, or retail prices fixed are invalid shall require the redetermination by the Commission of wholesale and retail prices as well as prices to producers.

"Whenever an order of the Commission fixing prices is remitted to the Commission with direction to reform the findings or orders in accordance with the opinion of the court and no further appeal is taken by the Commission, the Commission shall make such reformation within thirty (30) days from the entry of the order of the court, remitting the price fixing order to the Commission.

"(j) The Commission on its own motion or on application showing good cause, and by unanimous vote of the members of the Commission present, may suspend for as long as sixty (60) days any order relating to prices or handling, transporting, or cooling charges theretofore made by it or any part thereof, provided, that within sixty (60) days of the date of such suspension, the Commission shall hold a hearing as provided above and alter, revise, or amend said order in accordance with the determination made by it on the basis of the testimony at such hearing and provided further, that in event that no hearing should be held or no alteration, revision or amendment be made as result of a hearing within sixty (60) days of such suspension, such suspension shall automatically terminate. Provided further that prior to any meeting of the Commission to consider suspension of the provisions of any order, notice in writing that suspension of provisions of an order will be considered shall be mailed to each member of the Commission to be postmarked seven (7) days prior to such meeting.

"(k) It is hereby declared to be the legislative intent that the prices prescribed by the Commission under provisions of this section for milk produced in this State and sold or delivered or made available on consignment or otherwise in this State for shipment into and ultimate sale in another state shall not be destructive of the export market and shall not be destructive of the price structure of producers in such other state.

"(l) It is expressly provided that the Commission may fix lower minimum prices for contract sales of milk made on the basis of competitive bids to the State of Mississippi or any of its political subdivisions or institutions or to any religious or charitable institution or any school or hospital, than the minimum prices to other outlets. It is further provided that nothing in this Act shall be construed to prohibit the donation of milk to any religious or charitable institution.''

After the appointment of the members of the Commission, a time and place was set for the hearing of evidence as to the establishment of marketing areas within the State, and the fixing of prices for the sale of milk within such areas.

Pursuant to such notice, W. F. Vance and others filed their petition in which they set up that Section 15 of this Act is unconstitutional because it deprives them of their property without due process of law, denies to them the equal protection of the laws, and impairs the obligation of contracts existing between them and others. Alternatively, they prayed that, if mistaken as to the constitutionality of the Act, the Commission should allow a price differential so that they could sell their "special brand" milk at 1½-cents per quart and 3-cents per half gallon lower than the price of regular brand milk of the same type, grade, and quality.

A mass of evidence, both oral and documentary, was introduced to show the condition of the milk industry, the necessity for regulation and for fixing prices, and as to what would constitute fair and reasonable prices in all phases of the milk industry from the production of milk to its consumption by the public.

For instance, as descriptive of the producers' condition, Jack Barnett of Starkville, a Grade A farmer, with 500 acres of land, 75 insured cows, and a total investment of $125,000, testified that his cost of production was $5.32 per hundredweight for 1959; that such cost is very close to the average in that area; and that his return was only 2½%. E. L. Clearman of Sumrall, a dairy farmer, testified that in 1948 and in 1950, he had 50 to 60 cows and received $5.88 per hundredweight. His cost of production was $4.51 and his net profit was $3,451.23. In 1959, he was milking the same number of cows, produced 483,200 pounds and had a gross income of $24,-918.81. The price which he received was $5.16, but his cost of production was $5.37. He lost $1,008.48. W.

L. Maxey, Jr., Secretary-Manager of the Mississippi Milk Production Association, in support of the need for the prices which he was suggesting, gave a broad picture of the situation, as follows: In the Central Mississippi area, in January 1958, there were 1,057 producers; in January 1959, there were 1,007; and in January 1960, there were only 885. On those dates, in the Delta area, there were 385, 377, and 356, respectively. In January 1959 and in 1960, on the Coast, there were 469 and 404 producers, respectively.

Thus, in spite of the fact that Federal milk marketing orders, fixing minimum prices to the producers, were in effect, there was a loss in one instance and a very small profit in the other. It is also obvious that the greatest proportionate loss of producers was in the Central and Coast areas, where, according to the evidence, price wars had occurred in the past and were then in effect at certain places.

L. B. Vance, a member of the firm doing business as Vance Dairy, processors with a plant near Hattiesburg, Mississippi, testified that his firm bought all of its milk at the Class I price under the Federal Order No. 87, plus 5¢ a hundred, without shrinkage, from East Central Dairies of Newton, Mississippi. It packaged in special brands only Grade A fluid milk, with no half-and-half cream, whipping cream, or buttermilk. The milk was delivered in bulk to its plant, where it was processed, loaded into trucks, and delivered to the stores. The stores bore the cost of cooling, of handling after delivery to their platforms, of spoilage or other loss, unless it was the fault of the processor, and also of advertising. About three years ago, the plant's volume was 700 to 800 gallons a day. With the beginning of special brands—and the plant then had nine—the volume increased to 2,000 gallons a day. Fully 75% of its production went into special brands. The balance was bottled under the Vance brand, which the company advertised at a cost of at least

3¢ more per half gallon than the special brand. He did not think that his competitors would be at a disadvantage because their special brands were less than 1½% of the total volume of milk in their market. Unless his proposed differential was allowed, he was of the opinion that his business would be "killed". He admitted that there was a price war on in the Hattiesburg area at the time of the hearing; and that if everybody went into the special brand, all special brands would then be the same price. He asserted that his practice had never unstabilized the market in the special brand milk. He could not even imagine everybody packaging a special brand. He admitted that he sacrificed a large number of small customers because they were not big enough for such operation. By this course, his plant was able to sell a larger volume at a cheaper price; however, cheaper milk only disturbs within a mile or two. His plant packaged none of the by-products except in his own name. He said that, if all processors did as his plant does, the consumers "would have to use Pream." He admitted that milk is one of the essentials.

J. L. McCaffrey was operating three grocery and two dry goods stores in Forrest County, and handled all kinds of packaged milk. As the result of competition with LuVel over a 22-month period, he lost from $400 to $700 per month. This caused him to make a deal with Vance Dairy for his special brand. To do this, he had to buy his plate, do his own advertising, take the loss from spoilage, and bear the cost of display and handling the milk from the cooler to the service box, and he admitted that such expense was substantial. Roughly the markup from his cost of milk is 5¢, but he made 2¢ less on special than he did on regular brands. New customers were coming to him fast. He "was either taking them from other dealers or the country was growing mighty fast." His volume had more than doubled. He was selling at that time about 5,000 gallons of special

brand each month, which was as much or more than he sold of all regular brands. He was prospering even though he was selling below others because he increased his volume so much more. He said that he wants to see the farmers get all they can, and that they are entitled to an increase, but that many of them are not getting it. He admitted that, if handlers are forced, through competition, to process milk below cost, only the strong ones will survive; and if this happens, the price will probably be $1.00 per half gallon. He said that, in the last few years, a number of processors have gone out of business. His special brand, with his name on the carton, ''which is sitting on the table'', reminds the users of McCaffrey, and he takes advantage of it. He admitted frankly that he did not want any interference with his present system.

A number of witnesses testified in opposition to the allowance of the requested differential for special brand milk. Ben S. Sayle, comptroller of Walker Farms of Stoneville, was of the opinion that the type of operation which Vance and McCaffrey were using would not stabilize the milk industry; that most plants would have to process special brand milk; and that, in the end, very few people would be processing milk in the State. E. A. Delgadillo, an experienced operator of New Albany, expressed the opinion that, if special brands are excepted, this would be detrimental to the industry; that the situation was ''hard'' at the time of the hearing; that it would become worse on both the processor and the farmer; and that the economy of the community would be adversely affected. Melvin G. Ness, an experienced operator on the Coast, was of the opinion that such a differenital would create a surplus in that area, would give to the producers less ''take home pay'', would bring about chaotic conditions, and would result in the loss of many independents. With the Federal orders fixing the price of milk to be paid the producers, a processor would be ''like a man with his hands tied behind his back and

another man stands off with a horsewhip and picks him off.'' He described in detail what had happened in Hattiesburg when Vance went there about three years ago. There was a reduction in the volume of independent milk. Oftentimes people were seen to be leaving stores with 20 to 25 half gallons of milk in their cars. Milk was being used as a leader to bring customers into the stores. People drove farther because of the price concession. It did not increase consumption. It is to the advantage of the average store to have stabilized prices. Louis Jenkins, of Greenwood, who qualified as an expert in dairy marketing research, was of the opinion that such differential would be a disrupting influence. Price reductions spread rapidly. It would bring about an unstable and chaotic market situation. W. D. Newman of Gulfport, an operator of many years experience, was of the opinion that such differential would cause producers to realize less; it would constitute a special favor to those enjoying the privilege; and it would be detrimental and bring about instability. Jack Briscoe of Kosciusko, a producer, was of the opinion that such a differential would be most disruptive and would destroy everything that the Commission was set up to accomplish. This opinion was shared by Frank Miller of West Point, who has been in the milk business all of his life. To the same effect was the evidence of William Rhett, with the Realicious Dairies of Columbus, who was of the opinion that operations, such as were being carried on by Vance and McCaffrey, would absolutely disrupt the market, and that one good store in any town would bring about such result. Thomas W. Avent, a dairyman of Oxford, said that he could not adequately express what would happen if operations such as Vance and McCaffrey's were put into effect; but that it would effect a complete shake-up and produce instability. To the same effect was the evidence of Morgan Hardy with the Denton Dairy Products of Cleveland. J. S. Pearson, Region Manager and Secre-

tary of Pet Dairy Products Company at Jackson, heard the testimony in regard to special brands. He said that this practice has had a very unstabilizing effect in the past; and that, if allowed to continue, it will have a worse effect than in the past. That is one of the reasons why the Commission should eliminate the practice. Besides, if granted to one, it should be granted to all, so that ''we all get our feet wet together.''

On October 12, 1960, the Commission, in its finding of fact, among other things, pointed out that, under the ''special brand'' type of marketing, the store bears the cost of the plate used in labeling the cartons, the advertising of the milk, the cooling and transporting to the display room, and the loss from damage or spoilage except where it may be caused by the dealer or handler. Approximately 75% of the processed milk of Vance Dairy is used for special brand and 25% for its regular brand. The price, which it charges for the special brand varies according to the competitive situation and is manipulated in order to maintain a differential of $1\frac{1}{2}\cancel{c}$ per quart and $3\cancel{c}$ per half gallon lower than the cheapest competitive price in that area. By so doing, it produces a larger volume with a consequent increase in the net return in spite of the decreased price. If this practice should be permitted, every milk dealer or handler would be compelled to carry a special brand, in order to have an account with the larger stores. For economic reasons, the smaller stores could not be supplied with the special brand milk. Thus the larger handlers would be selling the special brand to the larger stores, and the smaller handlers, if any survived, would be selling the regular brand to the smaller stores at higher prices. This would create instability, would be detrimental to the best interests of the dairy industry and the inhabitants of the State, would result in lower net returns to the milk producers, and would defeat the objectives of the Milk Commission Act. Besides, it was found as a fact that, in

the past, wherever the Vance special brand milk has gone, it has created instability. It was further found as a fact that no enforceable contracts existed between the Vance Dairy and any other person, firm or corporation with respect to its special brand milk. For the reasons stated in its detailed finding, the Commission held that ''the selfish interest of a few must yield to the greater consideration of the public welfare of all the inhabitants of the State,'' and denied the petition.

The Commission, in its orders of October 2, 1960, found as facts and determined and adjudicated that the producers of milk are regulated by Federal Order No. 87; that the cost to the producers has increased 50% during the past ten years, but there has been little or no increase in the price received, thus resulting in a grossly inadequate return; that a large segment of the producers, due to financial loss, have gone out of the dairy business; and that this is detrimental to and against the best interests of the people of the State, whose health and well-being are vitally affected; that like conditions prevail with the processors and dealers, and, for the same reasons, have caused some of them to discontinue operations, and has resulted in the unemployment of many persons; that the processors and dealers, having to pay a minimum price for milk, under Federal regulations, and being compelled to sell at unregulated prices in a depressed market at inadequate prices, is detrimental to and against the best interests of the people; that producers of the given area do not produce enough milk to meet the demands for fluid milk during all months of the year, and this imbalance does not assure the people a sufficient quantity of pure and wholesome milk during all of the year, and that it is necessary to fix prices so that this result may be assured.

The Commission, on October 11, 1960, issued an order which established five marketing areas within the State. Those affected in this proceeding are the Central Mis-

sissippi Marketing Area and the Gulf Coast Marketing Area.

The Commission, on October 25, 1960, issued its finding of fact and orders for the Central Mississippi Marketing Area to become effective on Devember 1, 1960, as follows: (1) Finding of fact in reference to the establishment of minimum prices; (2) Producer Milk Pricing Order III establishing a minimum producer price of $5.85 per hundredweight for Class I milk; and (3) Wholesale and Retail Milk Pricing Order No. III establishing minimum wholesale and retail prices of milk and the various milk products. Similar findings were also issued for the Gulf Coast Marketing Area, to-wit: (1) Finding of fact in reference to the establishment of minimum prices; (2) Producer Milk Pricing Order No. IV establishing a minimum producer price of $6.00 per hundredweight for Class I milk; and (3) Wholesale and Retail Milk Pricing Order No. IV establishing minimum wholesale and retail prices of milk and the various milk products. Similar orders were also issued for the other three marketing areas with only slightly lower prices because of recognized economic reasons.

L. B. Vance and others, the petitioners, being aggrieved, appealed to the Chancery Court of Forrest County. In that court, they contended that Section 15 of the Act violates Sections 14, 16, and 17 of Article III of the Constitution of this State.

The learned chancellor, in a written opinion sustained that contention and declared said Section 15 unconstitutional and of no force and effect insofar as the rights of the appellants therein were concerned. From a decree in conformity with the opinion, the Milk Commission appealed.

The appellees contend that Section 15 of the Milk Commission Act, Chapter 155, Laws of 1960, on its face, and in its application to them, constitutes an invalid exercise of the police power in that it does not accomplish a public

purpose, but instead constitutes an arbitrary, oppressive and unwarranted interference with a wholesome, moral and legitimate business in violation of the rights secured to them under Article 3, Section 14 thereof (the due process clause), and Article 3, Section 17 thereof (which prevents the taking or damaging of private property except for public use and after making due compensation and reserving as a judicial question the determination as to whether the use is public).

On the contrary, the appellant contends that the fixing of minimum prices for the sale of milk, as provided in the Act, is constitutional as a legitimate exercise of the police power of the State, and is not in violation of either the "due process" or "equal protection" clauses of either the State or Federal Constitutions; that no impairment of contracts is involved; that the Legislature properly delegated authority to the Commission to effectuate the provisions of the Act, with sufficient basic standards for guidance; and that the findings of fact of the Commission were based upon credible evidence, and its orders are not unreasonable, arbitrary or capricious.

At the outset, the Court acknowledges its obligation to the attorneys on both sides for the masterly and exhaustive briefs which have been filed.

Beginning in the early thirties and prior to 1960, Milk Control Acts had been adopted in New York, New Jersey, Pennsylvania, Massachusetts, New Hampshire, Rhode Island, Vermont, Alabama, Florida, Virginia, California, Oregon, Indiana, Wisconsin, Montana, North Carolina, Maine, Connecticut, Georgia, and South Carolia. Their constitutionality was upheld in the first fourteen named states by the highest courts therein, although several of those Acts, as originally enacted, were declared unconstitutional. By reason of its own limitation, the Indiana Act expired on June 30, 1943. The Montana, North Carolina and Maine Acts have been in effect for

a number of years, but no one has seen fit to contest them. The Connecticut Act of 1941 received the sanction of inferior courts in the cases of Silverstein v. Hammerberg, 13 Conn. Sup. 259 and Hammerberg v. Farmers Cooperative, Inc., 12 Conn. Sup. 465, respectively; but its constitutionality does not seem to have been passed upon by the Supreme Court of Errors of the State. The Georgia Act was upheld twice, in 1938 and 1939. However, in 1951, when it was again attacked, it was declared unconstitutional. The Legislature of Georgia then enacted another Milk Control Act in 1952, but that Act has not yet been construed. The South Carolina Act was first adopted in 1953 and was amended in 1955. That Act, in 1960, was declared to be unconstitutional.

The Supreme Court of the United States has expressly upheld the constitutionality of the Milk Control Acts of New York, Pennsylvania and Virginia, and, by inference, those of California, Indiana, and Wisconsin, although certain aspects were invalidated because of interference with interstate commerce or for other reasons.

The fixing of minimum prices for milk was one of the main features of the New York legislative Act of 1933. In People v. Nebbia, 262 N. Y. 259, 186 N. E. 694 (1933), Nebbia was convicted of the sale of two quart bottles of milk and a loaf of "Italian bread" for eighteen cents. Concededly, this was a violation of the order of the Milk Control Board, which had fixed the minimum price for milk at nine cents per quart. The question before the Court was whether that feature of the Act was violative of the State and Federal Constitutions in that it interfered with the right of the milk dealer to carry on his business as suited his convenience, without state interference as to the price at which he should sell his milk. The opinion, while conceding that the regulation of private business can be invoked only under special circumstances, said: "It may be so invoked when the Legislature is dealing with a paramount industry upon which

the prosperity of the entire state in large measure depends. It may not be invoked when we are dealing with an ordinary business, essentially private in its nature. This is the vital distinction pointed out in New State Ice Co. v. Liebmann, 285 U. S. 262, 277, 52 S. Ct. 371, 76 L. Ed. 747.'' Saying that the production of milk, on account of its great importance as human food, was a chief industry of the state, the opinion declined to rule this feature unconstitutional, using these words: *"We are unable to say that the Legislature is lacking in power,* not only to regulate and encourage the production of milk, but also, when conditions require, *to regulate the prices to be paid for it, so that a fair return may be obtained by the producer and a vital industry preserved from destruction."* (Emphasis supplied.)

This case was appealed to the Supreme Court of the United States, and that Court, in Nebbia v. New York, 291 U. S. 502, 78 L. Ed. 940, 54 S. Ct. 505, 89 A. L. R. 1469 (1934), held that the Act in question was not violative of the Fifth and Fourteenth Amendments to the Constitution of the United States. In an elaborate opinion, the Court said: ''Under our form of government the use of property and the making of contracts are normally matters of private and not of public concern. The general rule is that both shall be free of governmental interference. But neither property rights nor contract rights are absolute; for government cannot exist if the citizen may at will use his property to the detriment of his fellows, or exercise his freedom of contract to work them harm. Equally fundamental with the private right is that of the public to regulate it in the common interest. * * * *These correlative rights,* that of the citizen to exercise exclusive dominion over property and freely to contract about his affairs, and that of the state to regulate the use of property and the conduct of business, *are always in collision.* No exercise of the private right can be imagined which will not in some respect, how-

ever slight, affect the public; no exercise of the legislative prerogative to regulate the conduct of the citizen which will not to some extent abridge his liberty or affect his property. *But subject only to constitutional restraint the private right must yield to the public need.* * * * The Constitution does not guarantee the unrestricted privilege to engage in a business or to conduct it as one pleases. Certain kinds of business may be prohibited; and the right to conduct a business, or to pursue a calling, may be conditioned. Regulation of a business to prevent waste of the state's resources may be justified. And statutes prescribing the terms upon which those conducting certain businesses may contract, or imposing terms if they do enter into agreements, are within the state's competency. * * * So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose. *The courts are without authority either to declare such policy, or, when it is declared by the legislature, to override it. If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied, and judicial determination to that effect renders a court functus officio.* * * * With the wisdom of the policy adopted, with the adequacy or practicability of the law enacted to forward it, the courts are both incompetent and unauthorized to deal. The course of decision in this court exhibits a firm adherence to these principles. Times without number we have said that *the legislature is primarily the judge of the necessity of such an enactment, that every possible presumption is in favor of its validity, and that though the court may hold views inconsistent with the wisdom of the law, it may not be annulled unless palpably in excess of legislative power.* * * * The

Constitution does not secure to any one library to conduct his business in such fashion as to inflict injury upon the public at large, or upon any substantial group of the people. *Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt,* and hence an unnecessary and unwarranted interference with individual liberty." (Emphasis supplied.)

The constitutionality of the Milk Act was again upheld by the New York Court in Noyes v. Erie & Wyoming Farmers Co-Operative Corp., 281 N. Y. 187, 22 N. E. 2d 334, wherein it was held that when the constitutionality of a statute is questioned, a known state of facts warranting legislative action is presumed; that the legislation was within the scope of the police power of the state; that the standards upon which the equalization of prices was to be fixed were definitely laid down in the Act; and that the order was not arbitrary, capricious or unreasonable. The constitutionality of the price fixing provisions of that Act was upheld by the Supreme Court of the United States in four other decisions, namely, Hegeman Farms Corp. v. Baldwin, 293 U. S. 163, 79 L. Ed. 259, 55 S. Ct. 7 (1934) ; Borden's Farm Products Co. v. Baldwin, 293 U. S. 194, 79 L. Ed. 281, 55 S. Ct. 187 (1934) ; Baldwin v. Seelig, 294 U. S. 511, 79 L. Ed. 1032, 55 S. Ct. 497 (1935) ; Borden's Farm Products v. Ten Eyck, 297 U. S. 251, 80 L. Ed. 669, 56 S. Ct. 453 (1936).

The first Milk Control Act of Pennsylvania was enacted in 1934 and amended in 1935. It provided for the fixing of maximum and minimum prices for milk. It was identical in essential respects with the New York Milk Control Act passed upon by both State and U. S. Supreme Courts in Nebbia v. New York, supra. On the first test, the trial court upheld its validity. On appeal the Superior Court held the Act to be unconstitutional,

saying that the Legislature could not fix such prices unless the business was affected with public interest. Rohrer v. Milk Control Board, 121 Pa. Sup. 281, 184 At. 133. Keller, President Judge, delivered a strong dissent. The Supreme Court reversed the judgment of the Superior Court, and adopted as its opinion the dissenting opinion of Judge Keller. Rohrer v. Milk Control Board, 322 Pa. 257, 186 At. 336 (1936). The concern was with whether the Act was violative of the due process clause (Article 1, Section 9), or the first section of the Declaration of Rights (Article 1) of the State Constitution. After enumerating many statutes of the state with reference to the fixing of prices on various articles, the opinion said: "It seems clear to me that, if statutes regulating, at one time or another, ferries, common carriers, hackmen, bakers, millers, wharfingers, and innkeepers were not interferences with private property, contrary to the Declaration of Rights, a statute regulating the modern milk industry is not violative of that constitutional provision; in view of the fact that it is a unique and basic industry, absolutely necessary for the health and well-being of the whole people, and there is ground for the enactment of the statute in the depressed condition of the productive end of the industry, with the reasonable expectation that, if it continues, it will result in widespread harm and injury to the general public. Certainly *there is nothing fixed and static about the industries or businesses which may be regulated in the public interest, in the exercise of the police power of the state.* * * *

"* * * In the early days of our existence as a state, even in town and urban communities, it was not uncommon for householders to keep their own cow, and the distribution and supply of milk was a comparatively simple matter, largely local in scope and operation. To-day it is expanded so as to be state-wide and even interstate in character. Exacting regulations looking to the public

health have already been enacted which greatly increase the cost of production. Practically no milk is produced for private consumption in town and city, and dairy farming has become a widespread industry, subject already to much regulation and inspection, on which the health and well-being of the people is largely dependent. The milk industry is not only absolutely vital to the health and well-being of the whole people, and especially growing children, but it is also unique and in a class by itself, because (1) milk cannot be kept by the producer, but must be delivered to the dealer within twenty-four hours of production; (2) the supply must exceed the demand by a reasonable margin in order to provide for emergencies, and this excess over the normal demand be put to less profitable uses and consequently paid for at a smaller price; (3) the method of payment is based on how it is utilized by the dealer, who reports to the producer the uses made of it; (4) it must be handled with the utmost care from start to finish, and is hedged about by a host of sanitary regulations, for the protection of the public, because it is a most fertile field for the growth of bacteria. These facts make the dairy farmer or producer dependent for his return on the use to which the dealer to whom he delivers it puts it. His commodity and the price he receives for it are so far out of his control that, as a matter of fact, his supposed freedom of contract is largely illusory and at the mercy of the dealer unless the Legislature intervenes for his protection; not primarily for his benefit, but only secondarily or incidental to the main purpose of promoting the public welfare by seeing to it that an adequate supply of pure milk is available at a price reasonable to the public, the dealer, and the producer. The collection, transportation, distribution, and supply of dairy products has gravitated into the hands of a comparatively few dealers, as compared with former conditions. One of the results of the process has been to lower the return to the producer so

that in many cases it is less than the cost of production, and commonly does not afford him reasonable compensation for his labor nor a fair return on his invested capital. A prolonged continuance of this condition would necessarily result in cutting down the herds of dairy cows, with a consequent shortage of product and corresponding high or exorbitant prices in a commodity absolutely essential for the health and well-being of our people, especially young children. * * *'' (Emphasis supplied.)

In addition this opinion in Rohrer v. Milk Control Board also quoted with approval the following excerpt from the decision of the Supreme Court of the United States in Nebbia v. New York, supra, to wit: ''Where the public interest was deemed to require the fixing of minimum prices, that expedient has been sustained. If the lawmaking body within its sphere of government concludes that the conditions or practices in an industry make unrestricted competition an inadequate safeguard of the consumer's interests, produce waste harmful to the public, threaten ultimately to cut off the supply of a commodity needed by the public, or portend the destruction of the industry itself, appropriate statutes passed in an honest effort to correct the threatened consequences may not be set aside because the regulation adopted fixes prices reasonably deemed by the Legislature to be fair to those engaged in the industry and to the consuming public. And this is especially so where, as here, the economic maladjustment is one of price, which threatens harm to the producer at one end of the series and the consumer at the other.'' The opinion further said: ''It may be that the results to be obtained will not measure up to those anticipated by the lawmaking branch, but that is not the lookout of courts. Its effects, certainly, cannot be measured until it is given a fair trial. If it proves not to be efficacious, the lawmaking body will, no doubt, repeal it. The wisdom of

legislation, if constitutional, is not a matter for inquiry by the courts.''

In two other cases, Colteryahn Sanitary Dairy v. Milk Control Commission, 332 Pa. 15, 1 At. 2d 775 (1938), and Rieck-McJunkin Dairy Co. v. Milk Control Commission, 341 Pa. 153, 18 At. 2d 868 (1941), the Court again upheld the constitutionality of the Milk Act. In the former, the Court held that the proper factors in price fixing were a legislative matter for the Commission to decide. The Milk Control Act of Pennsylvania was twice challenged in the Supreme Court of the United States, and, in both instances, the price fixing provisions of the Act were upheld as constitutional. Milk Control Board v. Eisenberg Farm Products, 306 U. S. 346, 83 L. Ed. 752, 59 S. Ct. 528 (1939) ; Penn Dairies v. Milk Control Commission, 318 U. S. 261, 87 L. Ed. 748, 63 S. Ct. 617 (1943).

The Milk Control Act of Virginia, Chapter 357, Laws of 1934, which includes the power to fix prices for milk, went before the Supreme Court of Appeals, and was held to be violative of the State Constitution. Reynolds v. Milk Commission, 177 S. E. 44 (1934). But, on reconsideration, the former decision was reversed and the prior dissenting opinion was adopted as the decision of the majority. Reynolds v. Milk Commission, 179 S. E. 507. The Court also said that the facts, declared in a statute, must be considered definitely established where they are not denied. The Act was again upheld on the ground of need to regulate an industry, which the Legislature had declared to affect public peace, health and welfare. Board of Supervisors of Elizabeth City County v. Milk Commission, 60 S. E. 2d 35 (1950). On appeal, the Supreme Court of the United States dismissed the cause for want of a substantial federal question. Board of Supervisors of Elizabeth City County v. State Milk Commission, 340 U. S. 881, 95 L. Ed. 640, 71 S. Ct. 198.

The Massachusetts Milk Control Act, Chapter 376, Laws of 1934, which authorizes the fixing of prices, was upheld by the Supreme Judicial Court. Milk Control Board v. Gosselin's Dairy, 16 N. E. 2d 641 (1938).

The Milk Control Acts of New Jersey, which authorized the fixing of maximum and minimum prices for milk, have been upheld by the courts of that state in the cases of State v. Newark Milk Co., 179 At. 116 (1935); Como Farms v. Foran, 71 At. 2d 201 (1950); and Abbotts Dairies v. Armstrong, 102 At. 2d 372 (1954).

After the Supreme Court of New Hampshire had held the Milk Control Law of 1935 void, (Ferretti v. Jackson, 188 At. 474, 1936), the statute, which authorized the fixing of prices for milk, was revised, and was then held valid except for certain sections which still gave unrestricted power to the administrative agency. In Re Opinion of the Justices, 190 At. 713 (1937). Subsequently, the Act was upheld together with the delegation of power as contained in the amended act. Cloutier v. State Milk Control Board, 28 At. 2d 554 (1942).

The Milk Control Act of Rhode Island, Chap. 2089 of the Laws of 1934, as therein amended in 1939 and 1940, which authorized the regulation and establishment of prices for milk, was upheld by the Supreme Court of the State. Opinion to the House of Representatives, 97 At. 2d 578 (1953).

The Milk Control Act of Vermont, first enacted in 1933 as an emergency, was made permanent by Chapter 99, Laws of 1937. The Supreme Court of the State upheld the law as a valid exercise of the police power for the control of a business affected with a public interest; and that the power of the Board to fix prices was not arbitrary or discriminatory even though they were not uniform in all parts of the state. State v. Auclair, 4 At. 2d 107 (1939).

The validity of the Milk Control Board, which had authority, under the general acts of the Legislature of

Alabama of 1935, to create natural marketing areas and fix minimum and maximum prices for milk, was upheld by the Supreme Court of Alabama in Franklin v. State, 169 So. 295 (1936). Because the production and sale of milk to the general public was a "business affected with public interest", it was held that it was subject to the exercise of the police power, even to the fixing of prices. In Taylor v. State, 186 So. 463 (1939), it was held that the controlling element in upholding the Milk Control Board was not the nationwide economic depression. In Ex parte Homewood Dairy Products Co., 3 So. 2d 58 (1941), it was held that the Legislature had the constitutional power to provide that the finding of facts by the Milk Control Board should be conclusive if due process was accorded by reasonable notice and the right to be heard.

In Miami Home Milk Producers Ass'n v. Milk Control Board, 169 So. 541 (1936), the attack centered on Section 13, the price-fixing section of the Florida Act, as being in violation of the due process and equal protection clauses of the Fourteenth Amendment to the Federal Constitution and similar clauses (Sections 1 and 12) of the Declaration of Rights in the State Constitution. The Supreme Court of the State, in upholding the act, held that "all reasonable presumptions will be indulged in favor of the constitutionality of a legislative act", and that the burden of allegation and proof is upon the party attacking legislative determinations of fact to show the contrary before the courts are justified in overturning them. In Shiver v. Lee, 89 So. 2d 318 (1956), the sole question for determination was whether the sections, relating to the power of the commission to fix maximum and minimum prices for milk, were constitutional. The Court held that the legislative purpose was to invoke the police power for protection of the public health, safety and welfare as well as the welfare of those engaged in the milk industry, and that the act was consti-

tutional. The opinion cited a large number of cases, and, in recapitulating the aims and ends of those cases, said:

"The general theory on which these cases proceed (most of which are milk cases) is that the milk industry is affected by elements of instability peculiar to the business that call for special control; it is one of the paramount businesses of the country and is geared to the health and welfare of the people, as well as the producer. Milk is perishable and can not long be stored; it is an excellent host for bacteria; it is essential to a balanced diet; babies could not subsist without it, in fact it is their primary medium of diet for the first year and it is settled that it is essential to the health of adults. If babies could vote as strong as cotton, beef, pork, corn, wheat, potatoes, peanuts and other commodities, the price of which is 'pegged,' at 'parity,' or close to it, the question raised here would have long been settled. These and other factors require safeguards to milk production and distribution that add materially to its cost. Safeguarding its purity and wholesomeness requires a vigilance greater than is required to preserve the purity of any other food product."

The California Milk Control law, enacted in 1935 and amended in 1937, was before the Supreme Court of the State in the case of Jersey Maid Milk Products Co. v. Brock, 91 P. 2d 577 (1939). The opinion held that the Legislature, under the police power, may regulate the marketing of milk and fix the price at which it may be sold. It recognized the principle of law that "all presumptions and intendments are in favor of the constitutionality of a statute enacted by the Legislature." The law was upheld as being constitutional. This case was followed in the subsequent cause of Ray v. Parker, 101 P. 2d 665 (1940), in which the Court said that "there can no longer be any question that the milk industry bears a close relation to the public welfare and is sufficiently clothed with a public interest to warrant its

regulation under the exercise of the police power, not only in emergencies *but at all times."* (Emphasis supplied.)

The first Oregon Milk Control Act was held unconstitutional in Van Winkle v. Meyer, 49 P. 2d 1140 (1935), largely because it contained no standard or guide and provided no rule of law by which the delegated powers were to be exercised. Subsequently the Act was amended, and the Supreme Court of Oregon held that the provisions were rational and reasonable; that they dealt with a subject which had a public interest; and that the law was valid under the State and Federal Constitutions. State, ex rel. Van Winkle v. Farmers Union Cooperative Creamery, 84 P. 2d 471 (1938). Later, in Savage v. Martin, 91 P. 2d 273 (1939), that Court, in upholding the Act, held that the milk industry was subject to regulation under the police power; that the state could delegate to the board the power to fix prices; and that the recitals in the Act should be given verity in the absence of countervailing evidence.

The constitutionality of the Milk Control Act of Indiana was upheld in Albert v. Milk Control Board, 200 N. E. 688 (1936). The opinion held that milk control was within the police power; that the milk supply was affected with public interest; and that the fixing of prices was valid. The constitutionality was again upheld in Milk Control Board v. Crescent Creamery, 14 N. E. 2d 588 (1938). The appeal to the Supreme Court of the United States was dismissed. 305 U. S. 559, 59 S. Ct. 87, 83 L. Ed. 352. This Act expired on June 30, 1943, and was not re-enacted.

The constitutionality of the Wisconsin Milk Control Law, which included the power to fix milk prices, was upheld in State v. Lincoln Dairy, 265 N. W. 197 (1936). Subsequently a section of Chapter 512, Laws of 1939, exempted certain cities, towns and villages. The Supreme Court of the state nullified that section, but held

that the remainder was constitutional and in effect. State v. Marriott, 296 N. W. 622 (1941). An appeal to the Supreme Court of the United States was dismissed. 314 U. S. 571, 62 S. Ct. 76, 86 L. Ed. 463.

The constitutionality of the Georgia Milk Control Act, passed in 1937, was upheld in Bohannon v. Duncan, 196 S. E. 897 (1938). The opinion of the State Supreme Court cited the decision of the U. S. Supreme Court in Nebbia v. New York, supra, and made this observation: "As was held in that case, the production, distribution and sale of milk to the general public is a business that vitally affects the public, and therefore subject to such legislative control and regulation, under a milk control board authorized, as by the Georgia act, to fix maximum and minimum prices after investigation and determination of the facts." The opinion said that the Nebbia case was controlling, so far as the challenge was concerned under the Fourteenth Amendment, and was strongly persuasive as to similar provisions of the State Constitution. The constitutionality of this law was again upheld by the Supreme Court of Georgia in the case of Holcombe v. Georgia Milk Producers Confederation, 3 S. E. 2d 705 (1939). The opinion held that the law was not unconstitutional as a delegation of legislative power by the Legislature; that "While it cannot be said that the General Assembly may legislate facts into existence, their declaration and determination of facts and conditions, when solemnized by enactment and approved by the executive, are generally held to be beyond the reach of judicial inquiry, where the right to enact such legislation is dependent upon the facts so recited, and provided such act does not impair or destroy purely private rights." The opinion further quoted with approval from 6 R. C. L., Section 112, in part, as follows: "If under any possible state of facts an act would be constitutional, the courts are bound to presume that such facts exist; and therefore the courts will not make a separate investiga-

tion of the facts, or attempt to decide whether the legislature has reached a correct conclusion with respect to them." But again the validity of the Milk Control Law, insofar as it provided for the Milk Control Board to fix prices of milk, was brought into question, and the Supreme Court, in Harris v. Duncan, 67 S. E. 2d 692 (1951), held that this provision violated the due process clause of the State Constitution; that the right of the seller and buyer to agree on a price is a property right; and that the milk industry is not such business "affected with a public interest" as to abridge the right of contract. The opinion, as an excuse for declining to follow the two previous decisions, said that "Neither of these cases are full-bench decisions." The reasons given in both the opinion and the concurring opinion were the same as those which were stated in the various dissents against the constitutional validity when various Milk Control Acts had been upheld. Following this decision, the General Assembly enacted another Milk Control Act in 1952 which declared that the industry is affected with a public interest and that an emergency situation required its regulation in the interest of the public health and general welfare. The constitutionality of this Act has not been raised.

In the original South Carolina Milk Control Act of 1953, it was expressly provided that nothing in the Act should be construed to give the State Dairy Commission the power to fix or control the price of milk or its products. The Act of 1955 increased the scope of the Commission's functions and also its power, whereby the Commission, after a public hearing, could declare a state of emergency to exist in any marketing area and thereupon fix the minimum prices to be charged by the producers, distributors and retailers. J. S. Myers, a large retail store in Greenville County, in lieu of advertising, offered the public "loss-leader" items, including milk, at retail prices below those charged by others and below

the cost to him. The Commission believed that this method of operation would disrupt the whole milk market on account of the necessity for competitors to reduce their prices; that, as a result, all parties would be adversely affected and the producers or dairy farmers of the state, who had a large investment, would be forced to sell their cattle, and close their dairies; and that the people of the state would again become dependent upon foreign sources of milk at whatever prices that the suppliers might charge. Consequently, the Commission conducted a public hearing after the requisite notice of the time and place. Considerable testimony was taken upon the threatening conditions in the market and the necessity for price-fixing. The Commission found that an emergency existed and that it was necessary to exercise its price-fixing powers. This it did in seeking an injunction against Myers to prohibit him from selling Grade-A milk at a price below the minimum price fixed by the Commission in that area. The defendant, by his demurrer, charged that the price-fixing provisions of the Act and the Commission's orders thereon denied him due process and the equal protection guaranteed by Art. 1, Section 5 of the State Constitution, thus presenting the question as to whether or not the State may fix the price at which a retail grocer may sell milk. The trial court sustained the demurrer, and the Commission appealed. The style of the case is Gwynette v. Myers, 115 S. E. 2d 673 (1960). The State Supreme Court, by a division of three to two, affirmed the judgment of the trial court. The opinion conceded that the right of a citizen to engage in lawful business, to make contracts, and to dispose of his property is not absolute; but that it is subject to regulation and control by the state in the exercise of its police power. Besides, it said that "Beyond doubt, the state has power to regulate and control the price that one in private business may charge for goods or services where such business is 'affected with

a public interest' ''. It then rejected the idea that the public health, safety or morals were involved, or that the milk industry was ''affected with a public interest''; and subscribed to the same line of reasoning, which may be found in opinions which dissented when the constitutionality of some of the milk control acts were upheld.

All of the milk control acts, which have been referred to in the foregoing pages, were either patterned after, or contained the essentials of, the Milk Control Act of New York, which was passed upon by the Supreme Court of New York and the Supreme Court of the United States in the appeals of Nebbia v. New York, supra.

■■■ The rationale of all of the decisions, upholding the constitutionality of the milk control acts, is that the milk industry is affected with a public interest and that the several legislatures, in enacting such laws, were exercising the police powers of the state. These cases clearly announce, and in fact there is no authority to the contrary, that the state exercises the highest governmental authority when it invokes its police powers. In other words, the police power takes precedence over all private rights even though they stem from constitutional bases.

In the case of State v. J. J. Newman Lumber Company, 102 Miss. 802, 59 So. 923, 103 Miss. 263, 60 So. 215, the Court had under consideration the constitutionality of Chapter 157, Laws of 1912, making it unlawful for those engaged in manufacturing or repairing to work their employees more than ten hours per day, with certain exceptions. The Court, in upholding the Act, held that the Legislature had the right, under its police power, to enact proper laws to regulate and provide for the ''safety, the health, the morals, and the general welfare of the public''; that the ''right of contract'' is subject to certain limitations, which the State may lawfully impose in the exercise of its police power; and that it is for the Legislature, and not for the Court, to de-

cide whether a law is needed and advisable in the general government of the people.

In Albritton v. City of Winona, 181 Miss. 75, 178 So. 799, it was contended that Chapter 1, Laws of First Extraordinary Session of 1936, known as the B. A. W. I. Act, was violative of Sections 14 and 17 of Article 3 of the State Constitution and also of the 14th Amendment to the Constitution of the United States, because of the proposed expenditure by the City of $35,000 for the purpose of acquiring, owning and operating, subject to limitations, a hosiery, knitting and wearing apparel manufacturing plant, with the right also to lease the lands and buildings. It was contended, in that case, just as here, that such an undertaking would be a complete departure from the concept of the forefathers and a step toward socialism; and that, if this could be done, the State and its subdivisions could take over and operate every business and industry. The opinion emphasized that the State exists for the purpose of promoting the welfare of its citizens, that is, their peace, happiness, and prosperity; that this duty rests with equal force on each of the three departments of government; that the Legislature is primarily charged with the duty of determining the means of accomplishment; that the judicial department must determine, in specific instances, whether the other two departments have exceeded the powers granted to them by the Constitution; and that "the courts are without the right to substitute their judgment for that of the Legislature as to the wisdom and policy of the act and must enforce it, *unless it appears beyond all reasonable doubt to violate the Constitution.*" (Emphasis supplied.) The opinion pointed out the existence of much unemployment and the low ebb of agriculture, from which most of the state's citizens derived their livelihood, and that manufacturing enterprises would tend to relieve unemployment and furnish markets for agricultural and other products. In holding the act

to be constitutional, the Court cited a number of cases, decided by the Supreme Court of the United States, including Nebbia v. New York, supra. The correctness of the Albritton case is so thoroughly recognized that it has been cited as authority in seven subsequent cases.

In Superior Oil Company v. Foote, 214 Miss. 857, 59 So. 2d 85, there was a clash between the rights of the lessors who demanded, under their contracts, the drilling of a well on their land within ten years, from the date thereof, and the regulatory laws of the state which were enacted for the conservation of oil and gas, and under which the Commission set up drilling units of 320 acres for natural gas and permitted the drilling of one well on that unit to suffice. In upholding the validity of the order of the Commission, as delegated by the Legislature in the regulatory laws, over the contractual rights of individuals, the opinion pointed out that ''The police power of the state includes not only regulations to promote public health, good morals, and good order, but also the right to regulate and to promote development of industry and utilization of natural resources in order to add to the wealth and prosperity of the State,'' citing the Albritton and other cases. The opinion then went on to say that the ''Miss. Const. of 1890, Sec. 16, provides that 'laws impairing the obligation of contracts, shall not be passed.' The U. S. Constitution, Art. 1, Sec. 10, cl. 1, has a somewhat similar provision. *However, it is well established that this provision is qualified by a proper exercise of the police power of the state.''* (Emphasis supplied.) Citing the Albritton case and State v. J. J. Newman Lumber Co., supra. The opinion also observed: ''Hence it is said that all contracts and property rights are subject to a reasonable exercise of the police power.''

■■■ There is actually no conflict between Town of McCool v. Blaine, 194 Miss. 221, 11 So. 2d 801, Saucier v. Life & Casualty Insurance Company of Tennessee, 189 Miss. 693, 198 So. 625, and Moore v. Grillis, 205 Miss.

865, 39 So. 2d 505, cited by appellees, and the principles laid down in the foregoing cases. After all, the test is whether or not the subject matter of the statute is one which is affected with the public interest, or which promotes the health, morals, safety, or general welfare of the people.

The Legislature declared, in the Milk Control Act, that the milk industry is affected with a public interest and that the regulations, therein imposed, are necessary to the general welfare and to the public health and safety. The appellees concede that, if these recitations and declarations are true, the regulations, therein imposed, constitute a valid exercise of the State's police power and are paramount to appellees' asserted constitutional rights under Section 14 of the Constitution. But they argue that, since the truth of the declarations is a judicial question, this Court should in fact take judicial knowledge that these declarations are false. To this end, they cite several cases, including Frederic v. Board of Supervisors of Jackson County, 197 Miss. 293, 20 So. 2d 92, a zoning case, and Jefferson Standard Life Insurance Company v. Noble, 185 Miss. 360, 188 So. 289 (1939), involving the moratorium act. In the first instance, it was held that the ordinance, as applied to the property there in question, was so arbitrary and unreasonable as to amount to confiscation; and in the second, that the nationwide depression no longer existed.

The legislative findings are presumed to be true and the act is presumed to be constitutional. The burden is on the one, who attacks the constitutionality of the Act, to show that such findings are false. The evidence of Vance and McCaffrey went almost altogether to their prayer for price differentials in favor of special brand milk. They admitted that this kind of operation, in the past, had brought about price wars and instability. The evidence of the other witnesses was to the effect that such an operation would result, and

had resulted, in chaotic conditions. They said it would injure the producers; that it would drive processors out of business; that it would result in unemployment; and that it would otherwise be against the general welfare of the people. The declarations in subsections (a), (b), (c), (f), (h), and (i) of Section 1 of the Act, supra, are obviously true. There is abundant evidence, together with the logical inferences therefrom, to show that the declarations in the remaining subsections thereof, namely, (d), (e), (g), (j), (k), and (l) are in fact true, although disputed in part by the evidence of Vance and McCaffrey. Consequently this attack must fail.

The appellees argue, in effect, that the Milk Control Acts began as a result of the nationwide economic depression of the thirties; that there is now no emergency of that kind; that the State is now in a wholesome condition; and that there is no necessity for such an act in this State.

It is true that some of the states did enact milk control laws to meet emergency conditions. However, after such conditions ceased, the laws were reenacted. Others passed the laws without any reference to such conditions. The fact remains that such laws are now in effect in the states heretofore named. It is true also that, under the Federal orders, there is now afforded to the producers a minimum price for their milk. But there must evidently be much trouble in, and danger to, the milk industry all over the country, even though a substantial majority of the states have not adopted milk control acts. The appellant, in its brief, has called attention to the fact that there are twenty-eight states in which unfair trade laws concerning milk and dairy products have been adopted, many of which were passed during the past decade.

 From what has been said in the foregoing pages, the Court is compelled to reach the following conclusions:

(1) Milk is an indispensable food, and, in certain respects, its production, conservation and distribution are unique.

(2) The milk industry is "affected with the public interest", and the Legislature of the State has so solemnly declared.

(3) The police powers of the State may be exercised in the proper control and regulation of an industry affecting the public interest, even to the extent of fixing prices for milk in all stages and forms, and the Legislature of the State has solemnly invoked those powers for the control and regulation of the milk industry, even to the fixing of such prices.

(4) The Legislature was primarily the judge of the necessity for such an enactment.

(5) Every possible presumption is in favor of the validity of such enactment.

(6) The facts, declared in the statute, must be considered to be definitely established when they are not denied.

(7) The burden was on the parties attacking the legislative determination of facts to show the contrary before the Court could be justified in overturning them.

(8) The police powers may be exercised when necessary to regulate and provide for the safety, the health, the morals, the development of industry, the utilization of natural resources, and the general welfare of the State.

(9) The standards, set up for fixing of prices, are fair and nondiscriminatory; and, if properly administered, should be of great benefit to the people of the State.

(10) The orders and regulations of the Commission are not unreasonable, discriminatory, or capricious.

(11) The Court cannot say, beyond reasonable doubt, that the Act in question is violative of Sections 14 and 17 of Article 3 of the Constitution of the State.

It therefore appears that the trial court was in error in its final decree, which dismissed, cancelled, annulled and declared to be unconstitutional and void the findings and orders of the Mississippi Milk Commission, as therein set out. Consequently, the decree is reversed, and a decree will be entered here, reinstating said findings and orders, and declaring Section 15 of the Act, together with its provision for price-fixing, not to be violative of Sections 14 and 17 of Article 3 of the State Constitution.

Reversed and decree here for appellant.

All Justices concur.