MONTANA MILK CONTROL BOARD, Plaintiff and Appellant, v. J. D. REHBERG, d/b/a MIDLAND GUERNSEY DAIRY FARMS, Defendant and Respondent.

No. 10389

Submitted June 12, 1962. Decided November 28, 1962.

376 P.2d 508

150

Mr. Justice Adair and Mr. Justice Doyle dissented.

Geoffrey L. Brazier, Helena (argued orally), for appellant.

Rexford F. Hibbs, Billings (argued orally), Maurice R. Colberg, Jr., Billings (argued orally), for respondent.

MR. CHIEF JUSTICE JAMES T. HARRISON delivered the Opinion of the Court.

This is an appeal from a judgment of the district court of Yellowstone County sustaining defendant's amended demurrer to plaintiff's amended complaint.

The plaintiff and appellant is the Montana Milk Control Board; the defendant and respondent is J. E. Rehberg doing business as Midland Guernsey Dairy Farms.

By its complaint, plaintiff alleges substantially the following. Defendant Rehberg owns and operates the Midland Guernsey Dairy Farms, and in his business Rehberg buys, bottles, and distributes milk through his retail dairy store and restaurant in Billings, Montana. Pursuant to the applicable provisions of the Revised Codes of Montana (R.C.M.1947, § 27-407), the Montana Milk Control Board promulgated Order No. 59-17 pertinent to Market Area No. II, wherein defendant does business, and which order set the minimum price for milk sold retail in half-gallon and one gallon containers at $0.47 and $0.90 respectively. In violation of this order the defendant did sell and is selling half-gallon and one gallon containers of milk for $0.45 and $0.85 respectively.

Plaintiff further alleges that if defendant's conduct is allowed to continue, irreparable injury will result to the plaintiff and to milk producers and distributors in Market Area No. 11; that a general demoralization of the fluid milk marketing and dairy industry will result in Market Area No. II as well as in neigh-

boring areas; that if the Order is not enforced the Montana Milk Control Board will lose the confidence of the dairy industry; that a major price war among the producers in the milk industry will result in loss of income to the producers; and, that an adequate supply of wholesome milk will be jeopardized.

Therefore, the plaintiff sought an injunction to restrain the defendant from selling milk for consumption at a price less than the minimum set by the Montana Milk Control Board.

By amended demurrer, in addition to alleging generally that the complaint does not state facts sufficient to constitute a cause of action, the defendant's most serious allegations specifically assail the constitutionality of the Milk Control Act in the following particulars: ((1) that section 27-407, deprives the defendant of property without due process of law; and, (2) that there is an unconstitutional delegation of legislative power since the Montana Legislature did not sufficiently establish a legislative policy to fix prices, nor did the Legislature prescribe adequate standards and guides in attempting to delegate the powers. Defendant further attacks section 27-424, R.C.M.1947, on the ground that an injunction will not lie to enforce a penal statute.

The district court entered a judgment sustaining defendant's amended demurrer and the cause is before this court on the pleadings alone.

In this case we are specifically concerned with sections 27-401 through 27-429, R.C.M.1947, an Act to supervise the milk industry in Montana, and which will hereinafter be referred to as the Act. This is by no means new legislation, the original Act having been enacted by the legislature in 1939, with substantial amendments thereto enacted in 1957 and 1959. Notwithstanding its long existence on the books, this court has never had to decide the constitutionality of the Act, however, we are not without authority and precedent in this area since courts of many of our sister states, as well as the United States Su-

preme Court, have spoken on the constitutional issues raised by milk control statutes similar to our own.

■■ Defendant contends the most fundamental deficiency of the Act to be, that it deprives him of property without due process of law in violation of Art. III, § 27, Montana Constitution. No authority need be cited for the basic and well-established proposition that the right to contract is a valuable property right protected by due process of law. However, it is equally basic and well-established that there is no absolute liberty to contract, such liberty being necessarily subordinate to reasonable restraint and regulation by the state in the exercise of its sovereign prerogative—police power. State v. Safeway Stores, Inc., 106 Mont. 182, 203, 76 P.2d 81 (1938). Hence, we must inquire into whether or not the price-fixing provisions of the Act abridge defendant's liberty to contract under the protection of due process of law. These provisions of the Act in question will be hereafter set out.

Undoubtedly, the most notable case concerning the constitutionality of price-fixing regulations in the milk industry is Nebbia v. New York, 291 U. S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469 (1934), wherein the United States Supreme Court held that the fixing of prices in the milk industry constituted a valid exercise of police power. The defendant in the instant case recognizes that the Nebbia case, as well as the numerous cases following its rationale, are authority against his position; however, he contends that the reasoning of Nebbia and similar cases is erroneous.

To sustain his position defendant cites this court to two recent Southern cases, which hold their respective Milk Control Acts unconstitutional. Harris v. Duncan, 208 Ga. 561, 67 S.E.2d 692 (1951); Gwynette v. Myers, 237 S.C. 17, 115 S.E.2d 673 (1960). Both jurisdictions deciding the above-cited cases admit they are in the decided minority, however, each justifies its respective holding on the ground that the milk industry is not "affected with a public interest" in its state so as to allow price-

fixing in exercise of the police power. It should be noted that following the decision in Harris v. Duncan, the Georgia General Assembly in 1952, amended its Milk Control Act empowering parties to contract in accordance with provisions of the Act for the sale of milk, and, if the parties have failed to contract, the transaction shall be pursuant to an order of the milk control board setting minimum prices. See Georgia Laws 1952, at page 55 et seq. To date the constitutionality of this extensive amendment has not been decided.

As to Gwynette v. Myers, supra, it suffices to say that it is a three to two decision and against the great weight of authority, and, of course, this court is not bound by decisions of the Supreme Court of South Carolina.

The jurisdictions upholding their respective Milk Control Acts are numerous. We do not intend to burden this opinion with an exhaustive citation to those cases. However, for a more complete collation of milk control cases and history of milk control legislation than is herein deemed necessary, a 1961 case upholding Mississippi's Milk Control Act is helpful. See Mississippi Milk Commission v. Vance, 240 Miss. 814, 129 So.2d 642 (1961).

The concept "affected with a public interest" has often been used to test the power of a state to fix prices. For example, this court in H. Earl Clack Co. v. Public Service Commission, 94 Mont. 488, 22 P.2d 1056 (1933), applied the test to the petroleum industry in Montana, holding that it was not "affected with a public interest" so as to enable the Legislature to fix prices relating to it.

"Affected with a public interest" is a vague concept not susceptible to precise delimitation, therefore, its value as a test in the price-fixing field has been criticized. See Hamilton, Affectation with Public Interest, 39 Yale L.J. 1089.

Regarding the concept, we are impressed with the language of the majority of the Florida Supreme Court in Miami Laundry Co. v. Florida Dry Cleaning and Laundry Board, 134 Fla.

1, 10, 183 So. 759, 763, 119 A.L.R. 956 (1938), where, in upholding a statute fixing prices in the laundry and dry cleaning business, the court said:

"There is no magic in the phrase, 'clothed with or affected with a public interest.' Any business is affected by a public interest when it reaches such proportions that the interest of the public demands that it be reasonably regulated to conserve the rights of the public and when this point is reached, the liberty of contract must necessarily be restricted. If the regulation involves the question of price limitation, it will be upheld unless clearly shown to be arbitrary, discriminating, or beyond the power of the legislature to enforce. [Citing cases.]''

■ Similarly, we think Nebbia v. New York, supra, properly sets forth the test we must use to determine whether or not the Montana Milk Control Act denies due process of law to the defendant Rehberg. In that case, the United States Supreme Court said: *"(T)he guaranty of due process \* \* \* demands only that the law shall not be unreasonable, arbitrary, or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained.* It results that a regulation valid for one sort of business, or in given circumstances, may be invalid for another sort, or for the same business under other circumstances, because the reasonableness of each regulation depends upon the relevant facts." (Emphasis added.) Nebbia v. New York, 291 U. S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469 (1934).

Viewing the record before us, we find that it is alleged that defendant Rehberg did sell and is selling milk at a price lower than the minimum price set by an order of the Montana Milk Control Board. Behind this order and the amended complaint filed herein is the legislative policy relating to milk declared in section 27-401 to be as follows:

"(a)   That milk is a necessary article of food for human consumption;

"(b)   That the production and maintenance of an adequate

supply of healthful milk of proper chemical and physical content, free from contamination, is vital to the public health and welfare;

"(c)  That the production, transportation, processing, storage, distribution and sale of milk, in the state of Montana, is an industry *affecting the public health and interest;*

"(d)  That unfair, unjust, destructive and demoralizing trade practices have been and are now being carried on in the production, transportation, processing, storage, distribution, and sale of milk, which trade practices constitute a constant menace to the health and welfare of the inhabitants of this state and tend to undermine the sanitary regulations and standards of content and purity of milk;

"(e)  That health regulations alone are insufficient to prevent disturbances in the milk industry and to safe-guard the consuming public from further inadequacy of a supply of this necessary commodity;

"(f)  That it is the policy of this state to promote, foster and encourage the intelligent production and orderly marketing of fluid milk and cream; to eliminate speculation and waste, and to make the distribution thereof between the producer and consumer as direct as can be efficiently and economically done, and to stabilize the marketing of such commodities;

"(g)  That investigations have revealed and experience has shown that, due to the nature of milk and the conditions surrounding the production and marketing of milk, and due to the vital importance of milk to the health and well being of the citizens of this state, it is necessary to invoke the police powers of the state to provide a constant supervision and regulation of the milk industry of the state to prevent the occurrence and recurrence of those unfair, unjust, destructive, demoralizing and chaotic conditions and trade practices within the industry, which have in the past affected the industry and which constantly threatened to be revived within the industry and to disrupt or

destroy an adequate supply of pure and wholesome milk to the consuming public and to the citizens of this state;

"(h)  That fluid milk is a perishable commodity, which is easily contaminated with harmful bacteria, which cannot be stored for any great length of time, which must be produced and distributed fresh daily, and the supply of which cannot be regulated from day to day, but, due to natural and seasonal conditions, must be produced on a constantly uniform and even basis;

"(i)  That the demand for this perishable commodity fluctuates from day to day and from time to time making it necessary that the producers and distributors shall produce and carry on hand a surplus of milk in order to guarantee and insure to the consuming public an adequate supply at all times, which surplus must of necessity be converted into by-products of milk at great expense and ofttimes at a loss to the producer and distributor;

"(j)  That this surplus of milk, though necessary and unavoidable, unless regulated, tends to undermine and destroy the fluid milk industry, which causes producers to relax their diligence in complying with the provisions of the health authorities and ofttimes to produce milk of an inferior and unsanitary quality;

"(k)  That investigation and experience have further shown that, due to the nature of milk and the conditions surrounding its production and marketing, *unless the producers, distributors, and others engaged in the marketing of milk are guaranteed and insured a reasonable profit on milk,* both the supply and quality of milk are affected to the detriment of, and against the best interest of the citizens of this state whose health and well-being are thereby vitally affected;

"(l)  That, *where no supervision and regulation are provided for the orderly and profitable marketing of milk,* past experience has shown that the credit status of both producers and distributors of milk is adversely affected to a serious de-

gree thereby entailing loss and hardship upon all within the community with whom these producers and distributors carry on business relations;

"(m)  That, due to the nature of milk and the conditions surrounding its production and distribution, the *natural law of supply and demand has been found inadequate to protect the industry in this and other states, and in the public interest it is necessary to provide state supervision and regulation of the fluid milk industry in this state.*"  (Emphasis added.)

The object sought to be attained by the law supervising the milk industry in Montana is the protection and promotion of public welfare and the elimination of unfair and demoralizing trade practices in the fluid milk industry.  R.C.M.1947, § 27-402.

The means selected to attain the object set forth in section 27-402 is a procedure whereby the Milk Control Board is empowered to establish marketing areas in the state and to prescribe and enforce minimum producer, wholesale, and retail prices in such areas pursuant to the provisions of the Act.  R.C.M. 1947, § 27-406.  We note that the licensing provisions set forth in sections 27-408 et seq. are also directed toward attaining the object enunciated by section 27-402; however, such provisions are not attacked in this action.

In Montana Milk Control Board v. Maier, 140 Mont. 38, 367 P.2d 305 (1961), there being no constitutional question raised by the pleadings, we held that the Montana Milk Control Board's complaint stated a cause of action under the license fee provisions of the Act.

In the instant case, to meet the test of the Nebbia case, we are faced with the question of whether the Act is unreasonable, arbitrary, or capricious, and whether the means selected has a real and substantial relation to the object sought to be attained.  The record before us does not contain one scintilla of evidence on behalf of the defendant directed to the foregoing question.

The law is well-settled that the burden is upon the one attacking constitutionality to prove beyond a reasonable

doubt that the questioned statute or Act is unconstitutional. Further, there is a presumption favoring constitutionality. See Parker v. County of Yellowstone, 140 Mont. 538, 374 P.2d 328 (1962).

Before us is the allegation that the defendant did sell and is selling milk in violation of Order No. 59-17 promulgated by the Milk Control Board, March 1, 1960. The Legislature in its wisdom has found that such control over the milk industry in Montana is necessary to insure an adequate supply of wholesome milk to the citizens of this state. Further, the Legislature has found that if the milk industry is not regulated, surpluses result, thereby forcing producers to ofttimes sell their milk below cost to the detriment of the industry as a whole. Certainly, it is important that the producers receive a fair return for their efforts. We think that the Legislature could find, as it did, that a fair and effective means to insure that producers would receive a fair return for their efforts is the method adopted in the Act, i. e., prescribing minimum producer, wholesale, and retail prices. Accordingly, we hold that the measures adopted by the Legislature in this instance withstand the due process test of the Nebbia case, supra.

We are told that by our decision in Union Carbide & Carbon Corp. v. Skaggs Drug Center, Inc., 139 Mont. 15, 359 P.2d 644 (1961), this court has demonstrated this state's dissatisfaction with price-fixing legislation. That case is simply not in point and is no authority against the position we take in the instant case. In the Union Carbide & Carbon Corp. case, the Fair Trade Act was held unconstitutional as price-fixing legislation because of a specific constitutional provision (Art. 15, § 20, Mont. Const.) prohibiting any *incorporation, stock company, persons or association of persons* from combining, forming a trust, or making a contract to fix prices. In the instant case we do not have an incorporation, stock company, persons or association of persons combining or contracting to fix prices. On the contrary, the Legislature of Montana has acted in exer-

cise of its police power to supervise the milk industry. The activity proscribed by Art. 15, § 20, Mont.Const., has no relation to police power.

It should be noted too that the Legislature amended Section 27-404 to provide that no member of the Milk Control Board should be in any way connected "with the production, processing, distribution, or wholesale or retail sale of milk or dairy products in any manner whatsoever," leaving such control in the hands of the public, the ones for whose benefit the Act was enacted.

Whether or not this legislation is economically sound we need not decide, because a determination of whether an economic policy is wise or unwise is within the province of legislative powers and the function of this court is only to measure the statute against constitutional standards. See Union Carbide & Carbon Corp. v. Skaggs Drug Center Inc., 139 Mont. 15, 359 P.2d 644, 650 (1961) and cases cited therein.

It is no answer to the constitutional issues raised by the minimum price-fixing provision in the Act to say that if we uphold the Milk Control Act, the Legislature can then go on unfettered and establish price controls in other areas of economic endeavor, such as the shoe industry. Such fears are unfounded. In the first place, the instant case is limited by the fact that it concerns milk control, not shoes, or other fields of economic activity. Moreover, we feel the due process test extracted from the Nebbia case, supra, correctly states the law and is an adequate device by which to measure the constitutionality of future legislative ventures into the field of price-fixing.

Next, defendant assails the Act on the grounds that there is an unconstitutional delegation of legislative power since the Legislature did not sufficiently establish a legislative policy to fix prices, nor did the Legislature prescribe adequate standards and guides in attempting to delegate the powers.

Defendant's assertion that the Legislature did not sufficiently establish a legislative policy to fix prices is without merit in

view of what has been heretofore stated. To be sure, the setting of minimum producer, wholesale, and retail prices is an important aspect of the Act; however, we do not think it is fatal to the Act, as defendant contends, because the Legislature, in its declaration of policy, did not say "it is the policy of the Legislature to allow the Board to set reasonable prices for the sale of milk." The Legislature did recognize that unless the producers, distributors, and others engaged in the marketing of milk are guaranteed a *reasonable profit,* both the supply and quality of milk are affected to the detriment of the health and welfare of the citizens of this state. R.C.M. 1947, § 27-401(k). Certainly, reasonable profit contemplates a minimum price at which milk can be sold in view of surrounding circumstances. The Board is empowered to set that minimum price in light of the circumstances, and as previously stated, this power has a real and substantial relation to the object sought to be attained.

Defendant's contention that the Act does not prescribe adequate standards and guides while attempting to delegate powers to the Board is likewise aimed at the price-fixing provisions of the Act. Concerning adequate standards and guides in delegation of legislative power, this court has stated the rule as follows: If the legislature fails to prescribe with reasonable clarity the limits of power delegated to an administrative agency, or if those limits are too broad, its attempt to delegate is a nullity.

On the other hand a statute is complete and validly delegates administrative authority when nothing with respect to a determination of what is the law is left to the administrative agency, and its provisions are sufficiently clear, definite, and certain to enable the agency to know its rights and obligations. Bacus v. Lake County, 138 Mont. 69, 354 P.2d 1056 (1960).

Defendant complains that the Act contains only one limitation upon the otherwise unfettered power of the Milk Control Board to fix prices. The procedure for fixing prices is detailed in section 27-407 as follows:

"Prior to the fixing of prices in any market the board shall conduct a public hearing and admit evidence under oath relative to matters of its inquiry, at which hearing the consuming public shall be entitled to offer evidence and be heard the same as persons engaged in the milk industry. The board shall by means of such hearing or from facts within its own knowledge, investigate and determine what are reasonable costs and charges for producing, hauling, handling, processing, and/or other services performed in respect to milk and what prices for milk in the several localities and markets of the state, and under varying conditions, will best protect the milk industry in the state and insure a sufficient quantity of pure and wholesome milk to adults and minors in the state, and be most in the public interest.

"The board shall take into consideration the balance between production and consumption of milk, the costs of production and distribution, and prices in adjacent and neighboring areas and states, so that minimum prices which are fair and equitable to producers, distributors and consumers may result.

"The board shall, at least ten (10) days prior to the date set for any public hearing on minimum prices, cause notice to be given to the consuming public and the milk industry of the specific factors which shall be taken into consideration in determining costs of production and distribution and of the actual dollars and cents costs of production and distribution which preliminary studies and investigations of auditors or accountants in its employment indicate will or should be shown at the hearing, so that all interested parties will have opportunity to be heard and to question or rebut such considerations as a matter of record.

"If the board at any time proposes to base all or any part of any official order fixing minimum prices upon facts within its own knowledge, as distinguished from evidence which may be presented to it at a public hearing by the consuming public or the milk industry, the board shall, at least ten (10) days

prior to the date set for any public hearing on minimum prices, cause notice to be given to the consuming public and the milk industry of the specific facts within its own knowledge which it will consider * * *.''

From the foregoing, it is seen that the Board is empowered to fix minimum prices which are fair and equitable to the producers, distributors, and consumers. In its determination, the Board must consider (1) the balance between production and consumption of milk, (2) the costs of production and distribution, and, (3) the prices in adjacent and neighboring areas and states.

Defendant contrasts the so-called generalizations in the price-fixing statutes of the Act with the standards enacted in the Unfair Practices Act, which was considered by this court in Associated Merchants v. Ormesher, 107 Mont. 530, 86 P.2d 1031 (1939). Section 1, Chapter 80, Laws of 1937, (now R.C.M. 1947, § 51-101), which is similar to Article XV, § 20, Montana Constitution, considered in Union Carbide & Carbon Corp. v. Skaggs Drug Center, Inc., supra, is aimed at preventing unfair competition in business by prohibiting sales of commodities below *cost* when done for the purpose of injuring competitors and destroying competition. In short the Unfair Practices Act is anti-monopoly legislation. In addition to injunction provisions (sections 51-109 and 51-111), violation of the Unfair Practices Act is made a misdemeanor. (R.C.M. 1947, § 51-112.) It can be readily seen that the key word in the Unfair Practices Act is *cost*. Violation of this Act depends upon whether or not the parties or entities named sell below *cost,* therefore, it is important that the term *cost* be precisely delimited in order that the parties are aware of their rights under the Unfair Practices Act. See section 51-103.

In the Montana Milk Control Act the term *cost* is used in an entirely different manner. In addition to the balance between production and consumption of milk and the prices in adjacent and neighboring areas and states, *costs* of production and dis-

tribution are factors to be considered by the Montana Milk Control Board in order to attain a fair and equitable minimum price. In view of this, we do not think that the terms "costs of production" and "costs of distribution" need be spelled out in the same precise manner as employed by the Legislature when it defined *cost* in the Unfair Practices Act.

The Montana Milk Control Board is empowered by the Act to require reports and to subpoena records and witnesses (see R.C.M. 1947, §§ 27-405(2) and 27-416), hence, it has sufficiently ample means by which to determine minimum prices which are fair and equitable. We therefore hold that the Act is complete and its provisions sufficiently clear, definite, and certain to withstand the test of the Bacus case, supra.

Finally, defendant contends that the remedy for injunction will not lie in this case because (1) there would be an improper use of injunction to enforce penal statute, and, (2) it is impossible to allege ultimate facts showing irreparable injury to plaintiff.

Violations of the Act are made misdemeanors. R.C.M. 1947, § 27-422. In addition, the Board may seek injunctive relief. R.C.M. 1947, § 27-424.

It is well-settled that an injunction will not be granted either to enforce or prevent enforcement of the criminal law. State ex rel. Bradford v. Ewing, 120 Mont. 463, 467, 187 P.2d 389 (1947). However, if the conduct denominated as criminal, such as violations of the Montana Milk Control Act, constitutes a nuisance, equity is empowered to grant preventive relief. Montana State Board of Examiners in Photography v. Keller, 120 Mont. 364, 368, 185 P.2d 503 (1947). Similarly, in State ex rel. Stewart v. District Court, 77 Mont. 361, 377, 251 P. 137, 49 A.L.R. 627 (1926), we said:

"Injunction lies to abate a nuisance, although maintaining the nuisance involves a crime. To that extent the strong arm of equity aids in preventing crime. In that case, however, there must be proof of what the law denominates nuisance as distin-

guished from mere crime. The general rule is that an injunction will not lie to prevent or punish the commission of a crime. It is not any part of the intention of the law that constitutional provisions shall be evaded by substituting a civil for a criminal procedure, or a single judge for a jury. [Citing case.]''

A nuisance is "Anything which is *injurious to health*, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable, enjoyment of life or property * * *." (Emphasis added.) R.C.M. 1947, § 57-101.

"A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal. R.C.M. 1947, § 57-102.

For the injunction provision to be valid, must the Act state in so many words that "the violation of this Act shall be deemed a nuisance?" We think not, nor do the cases so hold. As has been hereinbefore stated, we are dealing with a state's exercise of its police power imposing upon the milk industry reasonable regulation to conserve the rights of the public. The Legislature has acted in the public interest. We will not, in this portion of the opinion, reiterate the Legislature's declaration of policy relating to milk, however, a scant perusal of section 27-401 shows that the Act is aimed at activity which is injurious to health. As previously noted, anything which is injurious to health is a nuisance. We agree with the New Jersey court in State ex rel. State Board of Milk Control v. Newark Milk Co., 118 N.J.Eq. 504, 179 A. 116 (1935), that the remedy by injunction is an added means of making effective the orders promulgated to accomplish legislative purposes.

We see no merit in defendant's contention to the effect that injunction will not lie because it is impossible to allege ultimate facts showing irreparable injury to the plaintiff. The Legislature has spoken on this subject in its declaration

166

policy, which permeates the Act. This legislative policy backs the amended complaint of the Montana Milk Control Board, which manifestly shows a violation of Official Order No. 59-17.

The judgment is therefore reversed, and the cause remanded to the district court for further proceedings not inconsistent with this opinion.

MR. JUSTICES CASTLES and JOHN C. HARRISON, concur.

MR. JUSTICES ADAIR and DOYLE, dissented.