## 18251

Eugene E. STONE, H. Ciremba Amick, Fred T. Mills, R. M. Hanckel, George L. Tupper, R. L. Steer, Mrs. J. Allen Lambright, W. L. Harrelson, Hampton S. Caughman, and C. G. Cushman, composing the South Carolina State Dairy Commission, Plaintiff-Respondents, v. Robert G. SALLEY, Sr.. a producer on behalf of himself and all others similarly situated, Edisto Farms Dairy, Inc., a distributor, on behalf of itself and all others similarly situated, Defendants-Respondents, and E. W. Duckworth d/b/a Duckworth's Supermarket, a Store (Retailer) on behalf of himself and all other similarly situated, Defendant-Appellant, and Paradise Ice Cream Company and Piggly Wiggly Meeting Street, Charleston, S. C., Intervening-Defendants.

(137 S. E. (2d) 788)

532

*Messrs. Murchison, West & Marshall,* of Camden, *for Appellant,*

534

*Messrs. Daniel R. McLeod, Attorney General, Grady L. Patterson, Jr., Assistant Attorney General,* and *Thomas F. McCutchen, of Counsel,* and all of Columbia, *for Plaintiffs-Respondents,*

*Messrs. Legare & Hare,* of Charleston, and *James P. Mozingo, III,* of Darlington, *for the Defendant-Respondent, Robert G. Salley, Sr., a Producer on behalf of himself and all others similarly situated,*

*N. Heyward Clarkson, Jr.,* Esq., of Columbia, *for the Respondent, Edisto Farms Dairy,*

August 6, 1964.

Moss, Justice.

The State Dairy Commission of South Carolina promulgated an order, dated April 29, 1963, effective May 1, 1963, pursuant to the 1961 Dairy Commission Act, 52 Stats. 512, now Sections 32-1601 et seq., of the 1962 Code, fixing the minimum price of milk and prohibiting producers, distributors and retailers from selling such below the cost of production.

It appears that following the promulgation of the aforesaid order that eighteen separate suits were brought in various counties and courts throughout South Carolina, asserting that Sections 32-1635, 32-1640.3 and 32-1640.5 of the aforesaid Code violate Article I, Section 5, and Article I, Section 8, of the 1895 Constitution of this State, in that the attempt of the Commission to prevent sales of milk below cost of production thereof amounts to taking of property without due process of law and is a denial of the equal protection of the law.

The South Carolina Dairy Commission instituted this action under the "Uniform Declaratory Judgments Act", Section 10-2001 et seq., 1962 Code of Laws. The purpose of the action was to determine the constitutionality of the aforesaid cited sections of the Code and to have the aforesaid order of the Commission declared valid and constitutional.

The defendants in this action are Robert G. Salley, Sr., a producer, Edisto Farms Dairy, Inc., a distributor, and E. W. Duckworth, the owner and operator of a retail grocery store. These defendants are made parties in their individual capacities and as representatives of others similarly situated, pursuant to Section 10-205 of the Code. The producer and distributor above named answered the complaint herein, admitting the constitutionality of the Dairy Commission Act and joined in the prayer thereof. E. W. Duckworth, the owner and operator of a retail grocery store, by his answer, denied the constitutionality of the Dairy Commission Act in respect to the aforesaid cited sections thereof.

By consent this case was tried by the Honorable Louis Rosen, Judge of the First Judicial Circuit, without a jury. By order dated March 11, 1964, he ruled that the order of the State Dairy Commission was valid and constitutional and that Sections 32-1635, 32-1640.3 and 32-1640.5 of the Code were constitutional in giving to the Commission power to prevent sales of milk below the cost of production. Salley, the producer, and Edisto, the distributor, did not appeal from the order of the lower Court, but Duckworth, the retail grocer, did file timely notice of appeal to this Court.

Insofar as it upheld the Commission's Order forbidding the producer and distributor from selling milk to a retailer below the cost of production as fixed by the Commission, the judgment of the lower Court is unappealed from and presents no issue for determination by this Court. To that extent it is the "law of the case." *Matheson v. McCormac,* 187 S. C. 260, 196 S. E. 883. Duckworth cannot obtain a decision as to the invalidity of the Act on the ground that it impairs rights of others. *Tripp v. Tripp,* 240 S. C. 334, 126 S. E. (2d) 9. The appellant, in his brief, asserts that there is no factual or legal basis for a distincion between the issues in the present case and the *Gwynette case.* Therefore the question for determination here is the one stated in *Gwynette,* which was:

"The only provision of the Act that is challenged here is that which purports to empower the Commission to dictate to a retail grocer the minimum price at which he may sell wholesome milk that he has purchased from a distributor at the latter's price."

The testimony shows that Duckworth purchased milk for resale from Pet, Sealtest, Foremost and Lee Dairies at 49¢ per half gallon and has been selling same at retail for 39¢, thus taking a 10¢ loss per half gallon.

The appellant does not question the right of the State to regulate and control the production and distribution of milk with regard to sanitation and purity. Involved here, there-

fore, is no question of public health, safety or morals. The only provision of the Act that is challenged here is that which purports to empower the Commission to dictate to retail grocers the minimum price at which he may sell wholesome milk that has been purchased from a distributor at the latter's price, which said price has been fixed by the Commission.

The case of *Gwynette v. Myers,* 237 S. C. 17, 115 S. E. (2d) 673, was an action by the State Dairy Commission to enjoin a retail grocer from selling milk at a price below the minimum price fixed by the Commission for area as a controlled market. This Court, in a three to two decision, held that the business of selling milk was not affected with the public interest, regulation of milk prices was beyond state's police power, and statute which purports to give State Dairy Commission power to regulate retail price was to that extent unconstitutional. In the *Gwynette case* we had under consideration the 1953 and 1955 Acts of the General Assembly which had to do with the supervision and regulation of the milk industry in this State, including the production, processing, handling, distribution, and the disposal and sale thereof. The Commission was, by said Acts, authorized upon the conditions stated therein, to fix the minimum price to be charged for milk by producers, distributors and retailers. In answering the question as to whether the State had the right to fix the price at which a retail grocer could sell milk, this Court said:

"To fix the price at which the owner of a thing may sell it is to that extent, to deprive him of his property; for one's ownership of property consists not only of his right to possess it, but also of his right to use it as he pleases, to sell it at his own price, and to give it away if he wishes to do so. *Rogers-Kent, Inc. v. General Electric Co.,* 231 S. C. 636, 99 S. E. (2d) 665.

"The right of a citizen to engage in lawful business, to make contracts, and to dispose of his property, is not absolute; it is subject to regulation and control by the state in the exercise of its police power. But that power, though an

essential attribute of sovereignty, is also not absolute; it may be exercised only for the protection of the public in its health, safety, morals or general welfare. *Gasque, Inc. v. Nates,* 191 S. C. 271, 2 S. E. (2d) 36."

In the *Gwynette case* we also held that the State has power to regulate and control the price that one in private business may charge for goods or services where such business is "affected with a public interest" and conversely it may not fix prices in a business not so affected, is manifest not only from the fact that the police power is concerned with public, not private, welfare, but also for the reason that such governmental intermeddling with business essentially private in nature is repugnant to the fundamental concept of free enterprise.

We also held in the *Gwynette case* that whether or not the private status of a business, with its attendant freedom from regulation has changed to one in which the public has such an interest as to justify its regulation by the State, is always a matter for judicial inquiry; the mere declaration by the Legislature that a business is affected with the public interest is not conclusive of such inquiry. The extent to which a business affected with a public interest may be regulated by the State is not a matter solely within the legislative discretion. It depends on the nature of the business, on the feature which touches the public, and on the abuse reasonably to be feared.

We also held in *Gwynette* that the State may not dictate prices in a private industry merely because the industry is large and important or because the public may be concerned in respect of its maintenance, but such control is justifiable under the police power only when the industry is affected with a public interest in a sense that it may fairly be said that it has been devoted to the public use.

The appellant contends that the above cited sections of the Code should be declared unconstitutional for the reasons assigned in the *Gwynette case*. The re-

spondents contend that different facts are before this Court than were presented in *Gwynette* and that such case is not here controlling. It is true that the 1961 Dairy Commission Act repealed the Milk Acts considered in the *Gwynette case*. However different the Acts may be in verbiage, the manifest purpose of the repealed Acts and .the present Act was to set up a Commission to supervise and regulate the milk industry, including the fixing of prices to be charged for such milk by producers, distributors and retailers. In effect there is no difference in principle between allowing a Commission to set a retail minimum price as was done under the previous Acts and in allowing the Commission to set a minimum price based upon production costs of their own determination.

It is true, as is stated by the respondents, that the *Gwynette case* was decided upon a demurrer to the complaint, without the benefit of any testimony. However, it must be remembered that the demurrer admitted the well pleaded facts stated in the *Gwynette* complaint, which are not at material variance with the evidence submitted in the instant case. In the *Gwynette case* this Court considered the findings of fact with respect to the dairy industry, as was stated in the aforesaid Acts, together with its impact upon the public welfare and the economic factors involved in such industry, including the right to fix the price of milk, under the condition stated in the Act, as a means and method for the supervision and regulation of the milk industry. We concluded that the business of selling milk at retail was not affected with a public interest and the regulation of milk prices at the retail level exceeded the police power of the State and the statute which purported to give the Dairy Commission the power to regulate milk prices was unconstitutional.

We are fully cognizant that the right of a State to control the prices at which milk may be sold has been sustained by the Courts of many States and by the United States Supreme Court. However persuasive these

decisions may be they are not binding upon and do not control us in the interpretation of our own Constitution, under which the issue here arises.

It is apparent from the order under appeal and from the argument of the respondents that the purpose of the price-fixing here under attack is to protect the economy of the milk industry rather than the public health and welfare. But, as pointed out in *Gasque, Inc. v. Nates,* 191 S. C. 271, 2 S. E. (2d) 36, that is not a proper basis for the exercise of the State's police power.

If it be conceded that the General Assembly may authorize price-fixing as a means of regulating the milk industry for the general welfare and public good, in order to insure the public an adequate supply of wholesome and healthful milk, such has been accomplished, according to the facts in this case, because the appellant does not question the order of the Commission to fix the price that he must pay the distributor for the milk he purchases and which is later sold at retail to the public.

When the retail dealer purchases milk from the distributor at the price established by the Commission, and the producer receives from the distributor the price fixed and required by the milk control Act, it is difficult to see how the interest of either, or of the public at large, can be prejudiced or threatened by the retail dealer selling at such price as he sees fit. The sale of milk by the retail dealer below the price established by the Commission, where he has purchased such milk at the price established by the Commission, cannot adversely affect the producer and distributor. It seems to us that the sale of milk at a reduced price by a retailer, such retailer absorbing the loss, would increase the sale of milk and therefore be beneficial to the producer and distributor. Certainly, the public at large would have no complaint because of their ability to purchase milk at a reduced price.

We find no factual or legal basis for a distinction between the issue in the present case and that which was decided in the *Gwynette case*. We adhere to the

decision made in *Gwynette* because the legal conclusion there reached is sound. It follows that so much of the Act in question as attempts to fix the price at which the appellant may sell milk at retail is violative of due process and the equal protection clauses of our Constitution. This is the only question at issue in this appeal.

Reversed.

TAYLOR, C. J. and LEWIS, J., concur.

BUSSEY and BRAILSFORD, JJ., dissent.

BRAILSFORD, Justice (dissenting).

I respectfully dissent from the opinion of the Court which, in my judgment, fails to give required weight to the legislative findings contained in the preamble to the 1961 Act, to the uncontradicted evidence in this case, and to the findings of fact by the circuit judge on which he rested the conclusion that the milk industry is now affected with the public interest. Exception was taken to this conclusion, but none to the findings of fact on which it was reached. Therefore, those preliminary findings of fact must be accepted as true for the purpose of this decision.

In the preamble, the Legislature solemnly declared that the cost of producing, processing, and distributing milk, a primary and essential food, is to a great extent determined by strict sanitary regulations and minimum quality standards, which are imposed and supervised by the state in order to protect the health and welfare of the people by providing a wholesome supply of milk. Because of the highly perishable nature of milk and the rigid governmental controls over its production and distribution, and because of the unique methods by which it is produced, processed, and marketed, a dairy farmer has no "bargaining power in the market place," yet economic stability is necessary to enable those engaged in the industry "to comply with the rigid minimum sanitary and quality standards imposed by the State in the public interest." The Legislature further declared that de-

structive and demoralizing trade practices existed in the industry which had the effect of artificially depressing the price of milk and threatened to destroy the dairy industry of the State and deprive its inhabitants of "a constant supply of pure wholesome milk, and the same constituting a menace to the health and welfare of the inhabitants of this state * * *."

We quote the final paragraph of the preamble in full:

"Whereas, *in order to protect the well being of the people of the State of South Carolina, and to promote the public welfare and public health* and prevent the economic destruction of the dairy industry of this State in order to preserve free competition in the dairy industry and in the marketing of milk, the trade and commerce of the dairy industry should be supervised and regulated, chiefly with respect to the destruction of competition therein by the sale of products covered by this act below the costs thereof, as hereinafter provided in the exercise of the police powers of this State. Now, therefore,"

The Legislature has thus solemnly declared its intention to invoke the police power of the State in the promotion of the public welfare. It has found that an adequate supply of wholesome milk at all times is essential to the health of the people of this State, and that this can be assured only by preserving the dairy industry through economic controls. The findings are presumptively correct, and, on this record, they are supported by overwhelming evidence and by detailed findings of fact in the circuit court, from which we quote sparingly:

"I find that the health of the babies and young people of this State would be adversely affected if there were no adequate supply of fresh fluid milk. * * *

"Milk is generally regulated throughout the United States because it has been classified and recognized as an essential food for which there is no very close substitute. The purpose of control has been to insure the public of an adequate supply of high quality milk. * * *

*"I find that economic regulation is necessary to insure an adequate supply of fresh milk and that the milk industry in South Carolina cannot survive without some form of regulation.* I find that cow's milk and the marketing of it are affected with the public interest.

"Milk is mobile and may be and is transported long distances by tanker. Out-of-State milk cannot be supervised and inspected as closely, carefully and effectively as local milk. It is important to have local milk available, for surplus milk from other areas is not always available and, if so, at times at very high prices. * * *

"There is no free marketing of milk in the Southeast or in any major market in this Country. * * * (M)ilk controls came into existence to insure adequate supplies of fresh fluid milk. If regulation of milk were abolished in South Carolina (by nullifying Sections 32-1635, 32-1640.3, 32-1640.5 of the 1962 Code), then the effect would be to destroy the milk industry in South Carolina as an enterprise * * *, because South Carolina dairy farmers would be competing with farmers in other states who had guaranteed prices for their milk in their states or marketing areas and yet could sell their surplus in South Carolina in competition with South Carolina producers who had no minimum or regulation whatsoever. Thus the absence of regulation under the guise of freedom, when all those around had protective controls, would amount to destruction and liquidation.

"Sanitary requirements of themselves will not insure an adequate supply of milk; the pricing structure must be present.

"The time when dairying existed as a simple business enterprise, similar to other businesses, has ceased to exist. The inherently dangerous nature of milk, its essential nature as a food for which there is no reasonable substitute, the sanitation requirements which must be imposed to prevent epidemic and insure a product which will not injure the health of the public, the strict regulation of every facet of dairying, marketing, and distribution, the difference be-

tween milk and other perishable foods, and the regulations that have been imposed by other states and the Federal Government which, of necessity, affect its use, availability and price in South Carolina, all declare that milk is affected with public interest in South Carolina."

Both the Legislature and the circuit court found that economic regulation is necessary to insure an adequate supply of wholesome milk which, in turn, is essential to the health and welfare of an important segment of the public. Disregarding these findings, the opinion states, *"The appellant does not question the right of the State to regulate and control the production and distribution of milk with regard to sanitation and purity. Involved here, therefore, is no question of public health, safety or morals."* This *non sequitur* simply resolves the issue against the right of the Legislature to invoke the police power in this field, without pointing out any weakness in the evidence on which the findings by the Legislature and circuit court rested.

There is no dispute in the evidence that when the order of the Commission was issued the milk industry was in a critical economic condition because of price cutting, which started with the sale of milk as a "loss leader" item in retail stores and disrupted the market to such an extent that producers over much of the State were receiving less for their milk than the cost of production. Nor can there be any doubt that there is strong support in the evidence for the legislative and judicial findings that the dairy industry in South Carolina cannot survive without some form of price control. In truth, there is no evidence to the contrary. The question then is whether the preservation of the dairy industry, not for its benefit, but to issure, so far as possible, an adequate supply of wholesome milk for the people of the State in times of characteristic seasonable shortages may reasonably be considered a proper subject for legislation under the police power of the state; and, if so, whether the means adopted has a reasonable relation to that object. In my judgment, the record now before the court clearly requires an affirma-

tive answer to both aspects of the question and an affirmance of the decree of the circuit court.

Furthermore, this court is committed to respectful restraint in the exercise of its extraordinary power to nullify an act of the General Assembly on constitutional grounds, indulging every presumption in favor of validity and refusing to declare an act of the Legislature unconstitutional unless "its invalidity appears so clearly as to leave no room for reasonable doubt that it violates some provision of the Constitution." *Cox v. Bates,* 237 S. C. 198, 208-209, 116 S. E. (2d) 828, 832; West's S. C. Digest, Const. Law, Par. 48.

The constitutionality of legislation regulating the milk industry, including economic control, has the support of decisions of the United States Supreme Court and of some seventeen state courts of last resort, with only two opposed, to wit: *Gwynette v. Myers,* 237 S. C. 17, 115 S. E. (2d) 673; *Harris v. Duncan,* 208 Ga. 561, 67 S. E. (2d) 692.

The rationale of the authorities supporting the validity of price regulation in this industry was well stated in *Rohrer v. Milk Control Board* (1936), 322 Pa. 257, 186 A. 336, as follows:

"The milk industry is not only absolutely vital to the health and well-being of the whole people, and especially growing children, but it is also unique and in a class by itself, because (1) milk cannot be kept by the producer, but must be delivered to the dealer within twenty-four hours of production; (2) the supply must exceed the demand by a reasonable margin in order to provide for emergencies, and this excess over the normal demand be put to less profitable uses and consequently paid for at a smaller price; (3) the method of payment is based on how it is utilized by the dealer, who reports to the producer the uses made of it; (4) it must be handled with the utmost care from start to finish, and is hedged about by a host of sanitary regula-

tions, for the protection of the public, because it is a most fertile field for the growth of bacteria. These facts make the dairy farmer or producer dependent for his return on the use to which the dealer to whom he delivers it puts it. His commodity and the price he receives for it are so far out of his control that, as a matter of fact, his supposed freedom of contract is largely illusory and at the mercy of the dealer unless the Legislature intervenes for his protection; *not primarily for his benefit, but only secondarily or incidental to the main purpose of promoting the public welfare by seeing to it that an adequate supply of pure milk is available at a price reasonable to the public, the dealer, and the producer.*" (Emphasis added.)

On the other hand, a majority of this court, on the record before it in *Gwynette,* took the view that the milk industry was not affected with a public interest and that the legislative purpose in the enactment of the 1955 amendment permitting price fixing was to benefit the milk industry, rather than the public, with which latter, alone, the police power is concerned. Quoting from the opinion:

"The right of a citizen to engage in lawful business, to make contracts, and to dispose of his property, is not absolute; it is subject to regulation and control by the state in the exercise of its police power. But that power, though an essential attribute of sovereignty, is also not absolute; *it may be exercised only for the protection of the public in its health, safety, morals or general welfare.* (Emphasis added.)

"*Involved here is no question of public health, safety or morals.* * * * Beyond doubt, the state has power to regulate and control the price that one in private business may charge for goods or services where such business is 'affected with a public interest.' *Munn v. Illinois,* 94 U. S. 113, 24 L. Ed. 77. That, conversely, it may not fix prices in a business not so affected, is manifest * * * from the fact that *the police power is concerned with public, not private welfare* * * *."
(Emphasis added.)

Two justices, dissenting, thought that the Legislature, on sufficient grounds, had "sought to invoke the police power *for the protection of the health, safety and welfare of the general public,* as well as the welfare of those engaged in the milk industry." * 237 S. C. 17, 34, 115 S. E. (2d) 673.

However sound the view of the majority may have been at the time and on the record before the court in *Gwynette,* we are not relieved of our duty to indulge every presumption in favor of the truth of the 1961 legislative findings and of the constitutionality of the 1961 Act, and to determine *on this record* whether this appellant has sustained the burden of overcoming such presumptions beyond a reasonable doubt.

Gwynette, which was decided in 1960, did not attempt to foreclose judicial inquiry as to the validity of any subsequent legislation regulating prices in the milk industry. Quoting from the opinion:

"Whether or not the private status of a business, with its attendant freedom from regulation, *has changed* into one in which the public has such an interest as to justify its regulation by the state, is always a matter for judicial inquiry; * * *." (Emphasis added.) 237 S. C. 17, 25, 115 S. E. (2d) 673, 677.

After calling attention to the foregoing passage, the circuit judge stated, "I have made that inquiry and, based upon competent, impressive, compelling expert testimony, I conclude that milk is affected with a public interest."

---

* Since Gwynette was decided there have been three first impression decisions on the point by state courts of last resort, *Montana Milk Control Board v. Rebberg* (1962), 141 Mont. 149, 376 P. (2d) 508; *Borden Co. v. Thomason et al.* (1962), Missouri, 353 S. W. (2d) 735; and *Mississippi Milk Commission v. Vance* (1961), 240 Miss. 814, 129 So. (2d) 642. All three decided that price regulation in the milk industry may be supported as in the public interest. The Mississippi case, *supra,* contains an elaborate review of practically all of the authorities on the subject. We add that Georgia has been operating under price control under a new act since 1952 without further challenge.

The sharp difference in the facts which were before the court in *Gwynette* and those now presented was assigned by the circuit judge as one of his reasons for concluding that *Gwynette* is not controlling here. The opinion counters by stating that the well pleaded facts stated in the complaint in the *Gwynette case* were "not at material variance with the evidence submitted in the instant case." But the facts as deduced by the court in *Gwynette* unquestionably were different from those now appearing—materially different.

After analyzing the complaint, the court stated of the facts in *Gwynette:*

"There is no suggestion that any producer or distributor has yet been forced to reduce his price a penny as the result of the defendant's 'Loss leader' practice; nor is it suggested that the defendant or any other retailer in the area is presently unwilling to pay the price now being charged by the distributors or is buying from out-of-state sources. Upon the facts alleged, the 'emergency' would seem more fancied than real."

Compare this with the following unchallenged excerpts from the circuit decree:

"We are here concerned with statewide activity and the paramount interest of the citizens of the entire State. * * *

"Producer after producer testified in this case as to the devastating impact which the milk price war had on the price he received for his milk. Many were forced out of business and others are operating on the critical edge of insolvency at the present time because they were (and are) forced to take substantial reductions in the price received for their milk. Furthermore, all five distributors who appeared as witnesses testified that they also had been forced to reduce their prices substantially by virtue of the milk price war and/or 'loss leader' tactics. Thus, the emergency previously classified as fancied, has now become real and is a matter of record. * * *

"The record clearly shows that retailers were unwilling and in fact refused to pay the price charged by distributors. Thus the milk offered by the distributors (who were refused) lost its value since it could not be marketed as fresh fluid milk."

The value of a decision as a precedent must be tested by the facts "as assumed by the court; *they, as concerns the judgment, are the facts * * *.*" 14 Am. Jur., Courts, Section 72.

Although the decision in *Gwynette* is entitled to most respectful consideration, I concur in the view of the circuit judge that, for the reasons stated, *stare decisis* does not require adherence to it in passing upon the validity of the 1961 Act.

Finally, I am convinced that our decision cannot soundly be limited to a holding that "so much of the Act in question as attempts to fix the price at which the appellant may sell milk at retail is violative of due process and the equal protection clauses of our Constitution." This result is suggested because Salley, the producer, and Edisto, the distributor, did not appeal from the order of the lower court and, as to them, that order "is the 'law of the case.' " Actually, neither the producer nor the distributor had any ground of appeal because the circuit order gave them what they asked for in their respective pleadings. On the other hand, Duckworth's answer challenged the constitutionality of all three sections of the Act relating to pricing. By his exceptions, his statement of the questions involved, and his written and oral arguments on this appeal, he has persisted in this challenge.

Although it is apparent on this record that he is friendly to the Act and would like for the industry to operate under it, Duckworth, inferably, was chosen to make the challenge to it in this court, and his respected counsel have ably and fairly done so.

If it be suggested that Duckworth, as a retailer, has no standing to challenge those features of the Act regulating

the price at the distributor level, the short answer is that his interest in being free of an unconstitutional restraint on his right to bargain for milk at a price lower than that set by the Commission is equal to his interest in being free of such a restraint on his right to sell at any price he should choose. He has challenged both restraints by timely exception and argument and is entitled to a decision on both.

I take small comfort from the suggestion that the legislative purpose will not be thwarted because the price of milk will be regulated at the producer and distributor levels by the order of the Commission as "the law of the case." This necessarily assumes that all producers and distributors of milk are and will be bound by the order of the circuit court because Salley and Edisto Farms Dairy were named as representatives of their respective classes. The issues which would be involved in such a determination are not before us and have not and cannot be decided in this action.

Perhaps more important, the members of the Commission, as public officers, brought this action to obtain an opinion from this court declaring the Act, under which they are charged with certain responsibilities as to prices, constitutional. I am of the firm conviction that the Court should decide these issues now.

I would affirm the judgment of the circuit court.

BUSSEY, J., concurs.