18627

RICHBOURG'S SHOPPERS FAIR, INC. and Bi-Lo, Inc., Appellants, v. Eugene E. STONE, R. M. Hanckel, Fred T. Mills, C. G. Cushman, H. Ciremba Amick, George L. Tupper, R. L. Steer, Mrs. J. Allen Lambright, Hampton S. Caughman and W. L. Harrelson, composing the South Carolina State Dairy Commission, Respondents.

(153 S. E. (2d) 895)

*Robert E. Vandiver, Esq.,* of Watkins, *Vandiver, Kirven & Long,* of Anderson, *for appellants,*

*Messrs. Daniel R. McLeod, Attorney General, Grady L. Patterson, Jr., Assistant Attorney General,* and *Thomas E. McCutchen,* all of Columbia, *for respondents,*

*Messrs. Robinson, McFadden & Moore,* of Columbia, *for Winn-Dixie Greenville, Inc. as Amicus Curiae,*

*Messrs. Lourie & King,* of Columbia, *for Farm Bureau as Amicus Curiae,*

*Messrs. Murchison & West, H. W. C. Furman* and *Kenneth L. Holland,* of Camden, *for South Carolina Council of Milk Producers, Incorporated, et al., as Amicus Curiae,*

March 30, 1967.

LIONEL K. LEGGE, Acting Associate Justice.

Plaintiffs in this action sought to enjoin the defendants, who compose the South Carolina State Dairy Commission, from enforcing the provisions of Section 5 of Act No. 297 of the 1965 Acts of the General Assembly, alleging that said section was unconstitutional. In their answer, the defendants alleged: (1) that the plaintiffs were not real parties in interest and therefore had no standing to maintain the action; and (2) that the challenged legislation was constitutional and necessary for the prevention of unfair trade practices and monopolies.

The Honorable Earle M. Rice, to whom as Special Referee the cause was referred, found that the plaintiffs were real parties in interest, concluded that the challenged legislation was unconstitutional, and recommended that the defendants be enjoined from enforcing its provisions. From a Circuit Court decree overruling his report and dismissing the complaint the plaintiffs have appealed.

Act No. 297 was approved by the Governor on May 20, 1965. Section 5 reads as follows:

"Section 5. Section 32-1640.5 of the Code of 1962 is amended by striking the entire section and inserting in lieu thereof the following:

" 'Section 32-1640.5. (1) No store shall either directly or indirectly sell, advertise or offer for sale any brand of milk or milk product for less than the price at which all competing brands offered for sale by such store are sold, advertised or offered for sale, or discriminate in any way in the terms or conditions of sale against any competing brands of milk and milk products offered for sale by such store; provided, however, any difference in the unit price at which competing brands of milk and milk products are sold, advertised or offered for sale by a store which represents the difference between the minimum wholesale unit price established by the Commission and any higher net unit cost to such store of such product shall not constitute a violation of this section.

"(2) No store shall purchase for, consign to or otherwise make available any products covered by this article to another store for the purpose of or with the intent or effect of aiding or abetting such store in a violation of this article or for the purpose of aiding such store in circumventing an order issued by the Commission pursuant to the provisions of this article.' "

The plaintiff Richbourg's Shoppers Fair, Inc. owns and operates a retail supermarket in Anderson County; the plaintiff Bi-Lo, Inc. owns and operates several supermarkets in Anderson, Spartanburg and Greenville Counties. On the effective date of the 1965 Act and for a substantial period of time prior thereto both plaintiffs were selling at retail to the general public one or more brands of Grade A milk at a price or prices lower than that charged by them for other brands,—a merchandising policy which, as the complaint alleges, they desired and desire to continue. Shortly after the passage of the Act the Commission officially notified them of its enactment and warned them that it would take appropriate action in the event of any violation of the provisions of Section 5 occurring on or after June 8, 1965. Plaintiffs thereupon instituted this suit.

The appeal presents three questions:

1. Are the appellants real parties in interest?

2. Is Section 5 of Act No. 297 constitutional?

3. Is enforcement of its provisions necessary for the prevention of unfair trade practices and monopolies?

We preface discussion of the first of these questions with a brief sketch of the marketing system of the milk industry in South Carolina as disclosed by the evidence on both sides.

The dairy farmer (producer) sells to the distributor, who processes and packages the milk and delivers it to the retailer. (Some deliveries are made by the distributor directly to the ultimate consumer, but the evidence indicates that such house-to-house delivery is less economical from the distributor's standpoint than delivery in quantity to the retail outlet.) The retailer of course sells over the counter to the general public.

Milk is classified as follows:

Class I, that which is sold to the general public in bottles or cartons;

Class II, buttermilk and skim milk; and

Class III, that which has not been sold to the consumer as Class I or Class II, and which must therefore be sold to manufacturers.

At the time of the hearing before the Special Referee the prices, to the producer were:

For Class I, $6.60 per cwt.

For Class II, $5.00 per cwt.

For Class III, $3.00 per cwt.

The usual agreement between distributor and retailer is as follows:

1. The milk (Class I) is delivered to the retailer daily in such quantity as they may estimate will be sold by the retailer within four days.

2. The containers so delivered to the retailer are marked by the distributor with a code symbol indicating the date of such delivery.

3. In order to insure maximum freshness at the time of sale by the retailer, the distributor, upon making delivery to the retailer, picks up the milk shown by the code symbol to have been in the hands of the retailer for four days, and replaces it with milk of immediate freshness. The milk thus repossessed is resold by the distributor to a manufacturer, such as Borden & Company, as Class III.

4. Milk delivered by the distributor to the retailer is invoiced as of the date of delivery and is paid for on delivery or at such periods as the parties may have agreed upon.

5. Payment of the distributor to the producer is made at the end of each month on the basis of the ultimate disposition of milk sold by the distributor during that month. The price thus paid to the producer is the average, or "blend", price calculated upon the percentage of milk ultimately sold by the distributor in each of the three classes before mentioned.

In support of its claim that the appellants are not real parties in interest the Commission contends that because of the arrangement between distributor and retailer whereby milk unsold at the end of the four-day period is replaced, the milk remains the property of the producer until it is actually sold by a retailer to a customer. (We note, parenthetically, that with regard to Richbourg's "private brand" there was no agreement between distributor and retailer for replacement of unsold milk, a matter which in our consideration of the issues here involved we deem of no consequence.) In our opinion the appellants are real parties in interest and the Circuit Court's contrary ruling was erroneous, for the following reasons:

1. Appellants' transactions of purchase were with their distributors, not with the latters' producers.

2. The transactions between appellants and their distributors imposed no restrictions upon the right, manner, price or prices of sale by appellants to their customers.

3. Title passed from the distributors to the appellants by the express terms of the sales and the invoices accompanying them.

4. The uncontradicted evidence on both sides shows that appellants alone would have had to bear any loss resulting from destruction of, or damage to, the milk by fire, theft or casualty occurring after its delivery to them.

5. Under a contract of sale or return title passes to the purchaser subject to revesting in the seller in the event of return of goods in accordance with the terms of the contract. 46 Am. Jur., Sales, Sections 480, 481, 482, 484, pp. 647-651.

6. It is the ownership of the right sought to be enforced, rather than absolute ownership of specific property, that qualifies one as a real party in interest. Cf. 67 C. J. S., Parties, § 10, pp. 912, 913; 30 Am. Jur., Parties, Section 10, p. 859. Here the issue involved is not title to the milk (which is not challenged by the distributors who sold it to appellants or by any consumer to whom appellants sold it), but the right of appellants to sell it at such price or prices as they may choose.

7. The Commission, having officially warned appellants that their violation of Section 5 would result in "appropriate action" by the Commission, is in no position to contend that appellants have no justiciable interest in the issue of constitutionality of that section. (The punitive power of the Commission under Chapter 11 of Title 32 of the 1962 Code includes, Section 32-1640.6, the power to order the offending retailer's distributors to discontinue selling to him.)

Appellants' interest in the issue of validity or invalidity of Section 5 of the 1965 Act qualifies them as real parties in interest within the meaning of Section 10-207 of the 1962 Code.

The Act of April 27, 1953, 48 Stat. at L. 279, that created the Commission required a permit from the Commission as a prerequisite to the importation of milk into South Carolina. It gave the Commission power to inspect plants processing, distributing or receiving milk. It expressly prohibited the Commission from controlling the price of milk.

The Act of May 11, 1955, 49 Stat. at L. 496, reciting legislative findings as to the food value and the perishable nature of milk, the need for sanitary precautions, the economic importance of the milk industry and the Commission's inability to prevent milk price wars, gave to the Commission power to supervise and regulate the "entire Grade A milk industry", including the power, after a public hearing, to fix the wholesale and retail prices of milk. In *Gwynette v. Myers,* 237 S. C. 17, 115 S. E. (2d) 673, the provision for price-fixing at the retail level was held unconstitutional.

The Act of May 15, 1961, 52 Stat. at L. 512, reciting that supervision and regulation of the milk industry with respect to sales below cost was needed in order to prevent its economic destruction and to preserve free competition, provided that no store should sell milk below cost for the purpose of unfairly diverting trade from a competitor, lessening competition, creating a monopoly, or disrupting the orderly marketing of milk, and empowered the Commission to fix minimum prices to be paid producers. In *Stone v. Salley,* 244 S. C. 531, 137 S. E. (2d) 788, the provision empowering the Commission to fix minimum retail prices was held unconstitutional.

We are fully aware of the importance, and of the unique nature, of the milk industry. It may well be that some of its problems stem from a marketing system under which, as before noted, the dairy farmer has to bear the full loss occasioned by the transition from Class I to Class III of so much of his product as has not been sold at retail within the allotted period of four days, whereas the distributor is substantially, and the retailer wholly, insulated against risk of such loss. Other factors that obviously may tend to increase the percentage of Class I milk that ends its career in Class III are overproduction, overpurchasing by the distributor, and overstocking at the retail level. But it is not our function in the case at bar to determine the cause of those problems or to attempt to prescribe a remedy for them. Nor need we determine whether the loss-leader

policy of the appellants affects the economy of the industry adversely or favorably or at all. The issue here is "May the State regulate the price at which milk may be sold at retail?" That issue is substantially the same as that which was adjudicated in *Gwynette v. Myers* and in *Stone v. Salley;* and the decisions in those cases are controlling here. The fact that in each of them the court was divided does not lessen their validity or except them from the rule of *stare decisis. City of Florence v. Berry,* 62 S. C. 469, 40 S. E. 871; *Sellers v. Home Fertilizer Chemical Works,* 76 S. C. 343, 56 S. E. 978; *American Mortgage Co. of Scotland v. Woodward,* 83 S. C. 521, 65 S. E. 739; *Tate v. Lenhardt,* 110 S. C. 569, 96 S. E. 720; *Alexander v. Hunnicutt,* 196 S. C. 364, 13 S. E. (2d) 630.

Our conclusion that Section 5 of the 1965 Act is unconstitutional renders unnecessary discussion of the third question hereinbefore stated. Concern for the economic welfare of an industry cannot create in the legislature a power that is denied it by the Constitution.

Reversed.

Moss, C. J., and LEWIS J., concur.

BUSSEY and BRAILSFORD, JJ., dissent.

BUSSEY, Justice (dissenting).

While admittedly some of the language of the opinions in the *Gwynette* and *Stone* cases might be persuasive of the result reached by Mr. Justice Legge, I am of the view that those decisions are distinguishable, factually and legally, and, hence, not controlling here. Those cases decided that the State could not constitutionally fix the minimum price at which the retailer could sell milk. The court assumed, factually, in each case that the milk had been purchased by the retailer at a wholesale price, either fixed by the State or otherwise satisfactory to the producer and distributor, and that such milk was the absolute property of the retailer. As I understand them, the foundation of each of those decisions was the proposition that "One's ownership of prop-

erty consists not only of his right to possess it, but also his right to use it as he pleases, to sell it at his own price and to give it away if he wishes to do so."

While it is shown in the instant case that some small amount of milk is actually purchased and owned outright by the retailers, it is clear that the vast majority of fresh milk that reaches the general public does so through the marketing arrangement detailed in the opinion of Mr. Justice Legge. Under this arrangement, even though the legal title to the milk be in the retailer, it is quite obvious that, as found and held by the lower court, the producer and distributor under such arrangement still have a beneficial and economic interest in the milk while in the hands of the retailer, and the milk is, therefore, not the absolute property of the retailer.

The statutory provision here under attack does not seek to fix any price, either minimum or maximum, for which a retailer may sell milk. He is left absolutely free to fix any price he may desire on milk which he really owns. Fairly construed, all the law seeks to do is to prevent a retailer from putting a higher price on a brand of milk, in which he has comparatively little economic interest, than he does on some other competing brand, whether owned by him or not, and thereby price out of the market the brand of milk discriminated against. The retailer, of course, does not have to accept the brand of milk which he seeks to discriminate against, but he does accept it for sale to the public, and, in reality, accepts it, and pays for it, contingent upon its sale to the public.

For the foregoing briefly stated reasons, I conclude that the instant case is soundly distinguishable from our prior decisions; that the statute under attack is a proper exercise of the police power of the state, and infringes on no constitutional rights of the appellants.

If, contrary to my view, the law is to be held unconstitutional, I strongly suggest that the court should squarely

meet and decide a contention made here, which was not passed upon in either *Gwynette* or *Stone*. It is contended by the State that the statute is expressly authorized by Article IX, Section 13, of the Constitution which provides, *inter alia,* that "The General Assembly shall enact laws to prevent all trusts, combinations, contracts and agreements against the public welfare;".

My view of the case would make it unnecessary to reach or decide this question, and I shall not, therefore, discuss it at length. I do, however, make these observations. The constitutional language is that the General Assembly "shall enact laws to prevent * * *." In *Henderson v. McMaster,* 104 S. C. 268, 88 S. E. 645, the court said,

"The Constitution (article 9, § 13) requires the Legislature to enact laws to prevent agreements against the public welfare. The Legislature must primarily determine what agreements are against the public welfare."

The conclusion of the General Assembly and of the lower court that the statute here was essential in the interest of the public welfare, to prevent eventual monopolistic control of the supply of fresh, fluid milk available to the citizens of South Carolina is certainly not without evidentiary support.

BRAILSFORD, J., concurs.